UNITED STATES of America, ex rel.
D.J. FINDLEY, Appellant,

v.

FPC–BORON EMPLOYEES'
CLUB, et al., Appellees.

No. 95–7189.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 19, 1996.

Decided Jan. 24, 1997.

Order Denying Rehearing March 18, 1997.

Alan M. Grayson, McLean, VA, argued the cause and filed the briefs for appellant.

Michael L. Martinez, Washington, DC, argued the cause for appellees, with whom Lynn Estes Calkins was on the brief.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

D.J. Findley and Paul Lazerson brought this *qui tam* action alleging that government employees' clubs that earn revenue from vending services on federal property are violating the False Claims Act ("FCA" or "Act"), 31 U.S.C. §§ 3729–3733, by retaining monies owed to the government. The FCA permits private individuals such a cause of action against those who submit false claims to the government. Such plaintiffs are identified as relators and entitled to receive a portion of any government recovery for bringing suit.

The district court found that the practice of government employees' clubs retaining vending machine income was widely known at the time this action was brought and dismissed the case in reliance on the Act's jurisdictional bar against *qui tam* suits that are "based upon the public disclosure of allegations or transactions. . . ." 31 U.S.C. § 3730(e)(4)(A). This appeal, brought solely by relator Findley, calls for a first time interpretation in this circuit of aspects of the Act's public disclosure bar that have caused splits among our sister circuits. Our analysis of the language, structure, history and purpose of the FCA supports an interpretation of the public disclosure bar that limits *qui tam* jurisdiction to those cases in which the relator played a role in exposing a fraud of which the public was previously unaware. Because we find that Findley is not such a relator, we affirm the district court's dismissal of this action.

## I. FACTUAL BACKGROUND

Relators Findley and Lazerson learned of the circumstances underlying this suit while attending a pre-proposal conference to discuss a Bureau of Prisons ("BOP") request for proposals to service certain vending machines at Federal Prison Camp–Boron ("FPC–Boron"). At the conclusion of the conference they were handed a solicitation for services from members of the FPC–Boron Employees' Club concerning additional vending machines also located at FPC–Boron, but operated by the FPC–Boron Employees' Club rather than the BOP. The Employees' Club's machines are located in employee and visitor lounge areas at FPC–Boron. The BOP pays for the utilities used to operate the machines but, under the terms of a BOP Program 'Statement, the Employees' Club retains eighty-five to one hundred percent of the machines' profits.

Findley and Lazerson submitted a bid for the contract to service the Employees' Club's vending machines, but did not receive the contract. They protested to the BOP and the General Accounting Office ("GAO") regarding the propriety of the Employees' Club procuring such services, but their protests were denied. Thereafter, Findley and Lazerson filed this action against all employees' clubs of the BOP and the United States Department of Justice that earn revenue from the provision of vending services on federal property. They alleged that the vending machine revenue is used to fund social events and recreational junkets for federal employees and that the retention of the vending profits for these purposes violates a number of civil and criminal laws, including the FCA. The complaint names the Employees' Club at FPC–Boron as the representative defendant in the action. As required by the FCA, 31 U.S.C. § 3730(b)(2), relators filed their complaint under seal in order to permit the government 60 days to decide whether to intervene as plaintiff. The United States declined to intervene, and relators proceeded with the action.

The district court dismissed the complaint for lack of subject matter jurisdiction based upon a jurisdictional limitation on *qui tam*

actions which bars suits "based upon the public disclosure of allegations or transactions," unless the relator is an "original source" of the information underlying the allegation. *See* 31 U.S.C. § 3730(e)(4)(A). The district court relied on a 1952 Comptroller General Opinion which questioned the legality of postal employees' clubs retaining vending revenue and on legislative history of the Randolph–Sheppard Act, 20 U.S.C. §§ 107–107f, which granted blind vendors priority in operating vending machines on federal property. These two sources were both cited in *Texas State Comm'n for the Blind v. United States,* 796 F.2d 400 (Fed. Cir.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987), in which the Federal Circuit considered whether vending revenue secured at military exchanges was exempt from the Randolph–Sheppard Act.

The district court determined that these three public sources constituted public disclosure in a "General Accounting Office report," "congressional report," or "civil hearing" precluding *qui tam* jurisdiction of the practices alleged to violate the FCA because

> [b]efore the filing of this action, enough information was in the public domain to expose the allegation that government employees are perpetrating a fraud upon the government by maintaining vending machines on Federal property. The government itself presumably could have brought an action against employees' clubs such as the one at FPC–Boron ... [without] a *qui tam* suit in the present case.

*United States ex rel. Findley v. FPC–Boron Employees' Club,* No. 94–1477, slip opinion ("slip op.") at 8 (D.D.C. June 30, 1995). The court concluded that "[b]ecause the information that relators bring has been a subject of discussion in Congress, in the GAO, and in the Federal courts over the past forty years, as well as appearing in publicly available BOP documents, relators cannot be considered to possess the 'independent knowledge' necessary to be an 'original source.'" *Id.* at 9.

Relator Findley appeals the dismissal of his *qui tam* claim, arguing principally that he did not learn of the Employees' Club's false claims from publicly disclosed allegations or transactions, that his complaint alleges different transactions and allegations than those in the public domain and that he qualifies as an original source who is not barred by the public disclosures. This appeal raises issues that have led to disagreement among other courts of appeals that previously have considered the public disclosure bar, the central focus of which involve the relationship a *qui tam* relator must have to publicly disclosed allegations or transactions in order to trigger the FCA's jurisdictional bar and in order to benefit from the exception to the bar for original sources. Any attempt to interpret the oft-amended *qui tam* provisions of the FCA begins with the history of the Act, which illustrates Congress' effort to navigate between several interests that, at times, appear to work at cross-purposes with each other.

## II. THE DEVELOPMENT OF THE PUBLIC DISCLOSURE BAR

As enacted during the Civil War, the FCA allowed any private party to bring suit, in the name of the government, based on the individual's knowledge of fraud against the government. Act of March 2, 1863, ch. 67, § 4, 12 Stat. 698 (1863) (current version at 31 U.S.C. §§ 3729–3731). The *qui tam* provisions offset inadequate law enforcement resources and encouraged "a rogue to catch a rogue" by inducing informers "to betray [their] coconspirators." CONG. GLOBE, 37th Cong., 3d Sess. 955–96 (1863). The incentive to blow the whistle on fraudulent conduct was provided by the Act's provisions permitting a successful *qui tam* relator one-half of the recovery against the offending parties. S.REP. No. 345, 99th Cong., 2d Sess., at 10, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5275 ("Senate Report").

The Act was seldom utilized, however, until the 1930s and 1940s when increased government spending opened up numerous opportunities for unscrupulous government contractors to defraud the government. *Qui tam* litigation surged as opportunistic private litigants chased after generous cash bounties and, unhindered by any effective restrictions under the Act, often brought parasitic lawsuits copied from preexisting indictments or

based upon congressional investigations. Such ill-motivated suits not only diminished the government's ultimate recovery without contributing any new information, but the rush to the courthouse put pressure on the government to make hasty decisions regarding whether to prosecute civil actions.

When the Supreme Court decided *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), permitting a *qui tam* suit in which the relator copied his complaint directly from a criminal fraud indictment, Congress finally took action to prevent such piggy-back lawsuits. The House of Representatives supported a bill that would have repealed altogether the *qui tam* provisions. The Senate's bill would have barred jurisdiction where a *qui tam* suit was based upon information in the government's hands, unless the relator was the source of that information. Senate Report at 12, 1986 U.S.C.C.A.N. 5277. The Senate version prevailed, but the original source provision was dropped in conference. *See United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1153 (3d Cir.1991). Thus, the FCA, as amended in 1943, barred *qui tam* suits that were "based upon evidence or information in the possession of the United States ... at the time such suit was brought." Act of December 23, 1943, 57 Stat. 608, recodified in 31 U.S.C. § 3730(b)(4) (1982) (superseded).

As amended, the Act contained no protection for those whistleblowers who furnished evidence or information to the government in the first place. Citing the fact that Congress refused in 1943 to adopt a specific provision protecting the viability of *qui tam* suits brought by an original source of the information in the government's hands, the courts barred suits brought by those original sources. *See Wang v. FMC Corp.,* 975 F.2d 1412, 1419 (9th Cir.1992). But it soon became apparent that by restricting *qui tam* suits by individuals who brought fraudulent activity to the government's attention, Congress had killed the goose that laid the golden egg and eliminated the financial incentive

to expose frauds against the government. The use of *qui tam* suits as a weapon for fighting fraud against the government dramatically declined.

A 1984 Seventh Circuit decision highlighted another defect of the 1943 amendments to the FCA. In *United States ex rel. Wisconsin v. Dean,* 729 F.2d 1100 (7th Cir.1984) ("*Dean*"), the jurisdictional bar was interpreted to preclude the state of Wisconsin from acting as a *qui tam* plaintiff in a civil suit charging Medicaid fraud because the state had already reported the fraud to the United States Department of Health and Human Services, as required by statute. Even though it was Wisconsin that had brought the fraud to the federal government's attention, the state was barred from its own *qui tam* action because its own disclosure put enough information in the federal government's hands to trigger the jurisdictional bar. To exacerbate the inequity, the federal government had declined to intervene in Wisconsin's *qui tam* action and had filed a brief indicating that it believed that Wisconsin was a proper relator. *Id.* at 1102 n. 2. The Seventh Circuit nonetheless noted that "[i]f the State of Wisconsin desires a special exemption to the False Claims Act because of its requirement to report Medicaid fraud to the federal government, then it should ask Congress to provide the exemption." *Id.* at 1106.

In 1986, Congress responded to the Seventh Circuit's invitation by amending the Act yet another time in order to "encourage more private enforcement suits." Senate Report at 23–24, 1986 U.S.C.C.A.N. 5288–89.[1] After ricocheting between the extreme permissiveness that preceded the 1943 amendments and the extreme restrictiveness that followed, Congress again sought to achieve "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute on their own." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 649 (D.C.Cir.1994);

---

1. Portions of the legislative history of the 1986 amendments to the FCA specifically mention this holding of *United States ex rel. Wisconsin v. Dean.*

*See, e.g.,* Senate Report at 12–13, 1986 U.S.C.C.A.N. 5277–78.

*United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 321 (2d Cir.1992); *Wang v. FMC Corp.*, 975 F.2d at 1419. Accordingly, the 1986 amendments repealed the "government knowledge" jurisdictional bar and replaced it with a provision that restricts the subject matter jurisdiction of private plaintiff suits

> based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A). The statute describes an "original source" as

> an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(B). Predictably, these jurisdictional provisions too have led to extensive litigation and to circuit splits concerning the meaning of the words "based upon," "public disclosure," "allegations or transactions," "original source," "direct and independent knowledge" and "information." Virtually every court of appeals that has considered the public disclosure bar explicitly or implicitly agrees on one thing, however: the language of the statute is not so plain as to clearly describe which cases Congress intended to bar.

### III. ANALYSIS

Our fundamental task in interpreting the FCA is "to give effect to the intent of Congress." *United States v. American Trucking Ass'ns*, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). The starting point for interpreting a statute is the language of the statute itself. *Consumer Product Safety Comm'n v. GTE Sylvania Inc.*, 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). "In determining the meaning of the statute, we look not only to the particular

statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990). Finally, if ambiguity persists, we must construe the ambiguous term "to contain that permissible meaning which fits most logically into the body of both previously and subsequently enacted law." *West Virginia Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83, 100, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991). We review the district court's dismissal for lack of subject matter jurisdiction *de novo*. *Moore v. Valder*, 65 F.3d 189, 196 (D.C.Cir.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 75, 136 L.Ed.2d 35 (1996). In doing so, we construe the complaint favorably to relator Findley. *Id.*

The FCA sets up a two-part test for determining jurisdiction.

> First, the reviewing court must ascertain whether the "allegations or transactions" upon which the suit is based were "public[ly] disclos[ed]" in a "criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media." 31 U.S.C. § 3730(e)(4)(A). If—and only if—the answer to the first question is affirmative, will the court then proceed to the "original source" inquiry, under which it asks if the *qui tam* plaintiff "has direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. § 3730(e)(4)(B).

*United States ex. rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d at 651 (internal citation omitted). We begin with the public disclosure question.

### A.

The district court answered "yes" to the first part of the jurisdictional test, concluding that there was enough information "in the public domain to expose the allegation that government employees are perpetrating a fraud upon the government by maintaining vending machines on Federal property ... [without] a *qui tam* suit in the present case." *United States ex rel. Findley v. FPC–Boron Employees' Club*, No. 94–1477, slip op. at 8.

Findley responds that he never heard of the various reports and public statements upon which the district court relied for its conclusion, so his complaint could not have been "based upon" those public sources of information, and that the allegations and transactions that he uncovered were different from anything publicly disclosed in the manner set forth by the statute.

### 1. The Meaning of the Phrase "Based Upon"

Until the Fourth Circuit's decision in *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1347-50 (4th Cir.), *cert. denied*, — U.S. ——, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994) ("*Siller*"), all courts of appeals speaking to the question had implicitly agreed with the position of the Employees' Club here, that the jurisdictional bar is triggered whenever the relator files a complaint describing allegations or transactions substantially similar to those in the public domain, regardless of the actual source for the information in the particular complaint. The most complete explanation why the public disclosure bar should be applied in this broad manner has been provided by the Tenth Circuit. In *United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 552 (10th Cir.1992), *cert. denied*, 507 U.S. 951, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993) ("*Precision*"), the Tenth Circuit examined the phrase "based upon the public disclosure of allegations or transactions" and explained that "[a]s a matter of common usage, the phrase 'based upon' is properly understood to mean 'supported by.'" *Id.* Relying on the principle that "statutes conferring jurisdiction on federal courts are to be strictly construed, and doubts resolved against federal jurisdiction," *id.* (citing *F&S Construction Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964)), the Tenth Circuit reasoned that its limited interpretation of who could sue under the statute protected the incentive for private citizens with first-hand knowledge to expose fraud, but also prohibited civil actions brought by opportunists who do not contribute anything significant to the exposure of the fraud. *Id.*; *see United States ex rel. Doe v. John Doe Corp.*, 960 F.2d at 324 (a relator need not have actually derived his knowledge from a public disclosure in order for his action to have been "based upon" that disclosure); *see also Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562, 567 (11th Cir.1994); *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1158 (2d Cir.), *cert. denied*, 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993); *Houck on Behalf of United States v. Folding Carton Admin. Comm.*, 881 F.2d 494, 504 (7th Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1471, 108 L.Ed.2d 609 (1990).

■ The Fourth Circuit explicitly rejected that approach in *Siller*, and held that the term "based upon" bars only suits in which the information relied on by the relator was derived solely from the public disclosures. *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d at 1349. The Fourth Circuit turned to Webster's Third New International Dictionary, which defined "to 'base upon'" as meaning "to 'use as a basis for,'" and extrapolated that the phrase "based upon" in the FCA means "actually derived from." *Id.* According to the Fourth Circuit, such a definition gives fullest effect to Congress' desire to prevent parasitic lawsuits in which a relator freeloads off another person's effort to uncover fraud. The court explained that "a suit that happens to be similar (even identical) to [public disclosures], but [was] not actually derived from those public disclosures, simply is not, in any sense, parasitic." *Id.* We reject *Siller*, however, because our review of the language, structure, history and purpose of the FCA demonstrates that Congress sought to limit *qui tam* actions "to those in which the relator has contributed significant independent information [that is not already in the public domain]." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d at 653.

■ When the *Siller* court turned to Webster's Third New International Dictionary, it located an acceptable definition of the term "to 'base upon'" on which to reach its result, but the court performed its analysis without fully considering the context of the phrase's inclusion in the FCA. "A few words of general connotation appearing in the text of

statutes should not be given a wide meaning, contrary to a settled policy, 'excepting as a different purpose is plainly shown.' " *United States v. American Trucking Ass'ns*, 310 U.S. at 544, 60 S.Ct. at 1064 (citation omitted). Moreover, an equally reasonable reading of "[t]he language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit *qui tam* actions ... when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d at 654. Because the language of the statute is ambiguous, we must consider the structure and context of the ambiguous language in order to avoid expanding our jurisdiction beyond the scope intended by Congress.

■] We find the interpretation of "based upon" adopted in *Siller* inconsistent with the basic structure of the FCA because it renders the "original source" exception to the public disclosure bar largely superfluous. *See* Robert Salcido, *Screening Out Unworthy Whistleblower Actions: An Historical Analysis of the Jurisdictional Bar to Qui Tam Actions*, 24 PUB. CONT. L.J. 237, 272–73 (1995). The FCA requires that a relator have "direct and independent" knowledge of the alleged fraud or some of its components, and have voluntarily provided the information to the government, in order to benefit from the "original source" exception to the jurisdictional bar. *See* 31 U.S.C. § 3730(e)(4)(B) (emphasis added). Independent knowledge is "knowledge that is not itself dependent on public disclosure." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d at 656 (citing *Houck on Behalf of United States v. Folding Carton Admin. Comm.*, 881 F.2d at 505).

Why, one may ask, assuming the Fourth Circuit test of "based upon" as meaning "derived from," would Congress provide an exception in the case of a relator who has actually derived his complaint from public information, that allows him to demonstrate that he already provided his independently obtained knowledge to the government before he filed suit? Such a test strains the meaning of the word independent to encompass a relator who, after reading about a fraudulent transaction in The Washington Post or The Washington Times, conducts an "independent" investigation to obtain direct knowledge of the fraud and beats the government to the courthouse. Such relator could fulfill the "original source" governmental notice requirement by delivering a courtesy copy of a proposed complaint outlining the same information that is in the public domain to the Attorney General the day before filing the official complaint under seal and serving it on the Attorney General.[2] Thus, under the Fourth Circuit's interpretation, the primary "based upon" test swallows the original source exception whole. Using "based upon" as a proxy for whether the relator's complaint merely parrots what is already in the public domain, on the other hand, leads logically to a subsidiary inquiry into whether the relator had obtained the information in his complaint independently prior to the disclosure and so is an "original source."

We believe the background of Congress' repeated attempts to craft a *qui tam* provision that "encourag[es] whistleblowing and discourag[es] opportunistic behavior ...," *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d at 651, supports our broader construction of the jurisdictional bar to encompass situations in which the relator's complaint repeats what the public already knows, even though she had learned about the fraud independent of the public disclosures. While the overarching purpose of the 1986 amendments was to encourage more private enforcement suits, *see* Senate Report at 23–24, 1986 U.S.C.C.A.N. 5288–89, a specific element of the change was to " 'correct[ ] restrictive [court] interpretations of

2. Congress provided that *qui tam* complaints be filed under seal and served only on the government in order to allow the government an adequate opportunity to fully evaluate the private enforcement suit and determine both if that suit involves matters the government is already investigating and whether it is in the government's interest to intervene and take over the civil action. 31 U.S.C. § 3730(b); *See* Senate Report at 24, 1986 U.S.C.C.A.N. 5288–89; *see United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995 (2d Cir.1995). This requirement would make the "original source" governmental notice requirement appear to serve little purpose.

the [A]ct's. ... *qui tam* jurisdiction' provisions." *Wang v. FMC Corp.,* 975 F.2d at 1419 (second alteration and omission in original) (quoting Senate Report at 4, 1986 U.S.C.C.A.N. at 5269).[3] The legislative history to the 1986 amendments confirms that *United States ex rel. Wisconsin v. Dean,* 729 F.2d 1100, in which Wisconsin was precluded from pursuing a *qui tam* action simply because it had previously provided the government with the same information upon which it based its suit, provided a catalyst for enacting the liberalizing revisions. *See* Senate Report at 12–13, 1986 U.S.C.C.A.N. 5277–78. The 1986 amendments were thus "remedial, not innovative. Congress wanted in 1986 what it apparently thought it had in 1943: a law requiring that the relator be the original source of the *government's* information." *Wang v. FMC Corp.,* 975 F.2d at 1419 (emphasis in original).

Indeed, the legislative history to the 1986 amendments refers only to the court's refusal to recognize an original source exception to the jurisdictional bar. It did not seek to alter or even mention another critical interpretation of the *qui tam* provision in *Dean,* consistent with a long line of prior cases, that the jurisdictional bar is triggered whenever "the evidence and information in possession of the United States at the time the FCA suit was brought was sufficient to enable it to adequately investigate the case and to make a decision whether to prosecute." *Pettis ex rel. United States v. Morrison–Knudsen Co., Inc.,* 577 F.2d 668, 674 (9th Cir.1978); *see*

*United States ex rel. Wisconsin v. Dean,* 729 F.2d at 1103–04; *United States ex rel. Joseph v. Cannon,* 642 F.2d 1373, 1377 (D.C.Cir.1981) (same), *cert. denied,* 455 U.S. 999, 102 S.Ct. 1630, 71 L.Ed.2d 865 (1982); *United States ex rel. Weinberger v. Florida,* 615 F.2d 1370, 1371 (5th Cir.1980). In applying this test, these courts had to implicitly reject any interpretation of the phrase "based upon" that required the individual relator to have gathered his information from the government's files. For example, the *Dean* case held that Wisconsin's *qui tam* action was *"based upon* evidence or information in the possession of the United States" because the government could have brought its own FCA suit, even though it was undisputed that the facts alleged in Wisconsin's *qui tam* complaint were not "derived" from information in the hands of the federal government at the time the suit was brought.

When Congress amended the Act in 1986, the jurisdictional bar was changed from one precluding actions "based upon evidence or information in the possession of the United States" to one precluding actions "based upon the public disclosure of allegations or transactions...." Congress thus changed the focus of the jurisdictional bar from evidence of fraud inside the government's overcrowded file cabinets to fraud already exposed in the public domain. *See United States ex rel. Rabushka v. Crane Co.,* 40 F.3d 1509, 1521 (8th Cir.1994) (Magill, J., dissenting), *cert. denied,* —— U.S. ——, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995).[4] We find no

**3.** To enhance the incentive to bring *qui tam* actions, the amendments added protection for original sources, increased monetary awards, adopted a lower burden of proof, and allowed relators to continue to participate in the actions after intervention by the government. *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d at 1154.

**4.** Several courts have interpreted the change in the focus of the jurisdictional bar from government knowledge to public knowledge as serving the purpose of expanding the universe of potential *qui tam* relators to include those classes of government employees that are not otherwise specifically precluded by the statute from bringing a *qui tam* action. *See, e.g., United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493 (11th Cir.1991); *United States ex rel. Hagood v. Sono-*

*ma County Water Agency,* 929 F.2d 1416 (9th Cir.1991); *Erickson ex rel. United States v. American Inst. of Biological Sciences,* 716 F.Supp. 908, 918 (E.D.Va.1989); *but see United States ex rel. Fine v. Chevron, U.S.A., Inc.,* 72 F.3d 740, 743–44 (9th Cir.1995) (government auditor can never be an "original source" because he can never be deemed to have provided the information to the government "voluntarily"), *cert. denied,* —— U.S. ——, 116 S.Ct. 1877, 135 L.Ed.2d 173 (1996).

Another reason for this particular change to the jurisdictional bar was to prod the government into action. *See* Senate Report at 3–4, 7–8, 24–26, 1986 U.S.C.C.A.N. 5268–69, 5272–73, 5289–91 (discussing inadequacy of government FCA enforcement). *See United States ex rel. Doe v. John Doe Corp.,* 960 F.2d at 323. That purpose was not served by stopping *qui tam* suits whenever evidence or information of fraud was buried somewhere in a government file. Permit-

support either in the language or the legislative history of the 1986 amendments, however, that in making this alteration Congress intended to change the established meaning of "based upon."

While our interpretation of the jurisdictional bar may on occasion prevent *qui tam* lawsuits that may not be truly "parasitic," the blocking of freeloading relators who copy their complaints directly from public disclosures is not the FCA's only concern. From its inception, the *qui tam* provisions of the FCA were designed to inspire whistleblowers to come forward promptly with information concerning fraud so that the government can stop it and recover ill-gotten gains. Once the information is in the public domain, there is less need for a financial incentive to spur individuals into exposing frauds. Allowing *qui tam* suits after that point may either pressure the government to prosecute cases when it has good reasons not to or reduce the government's ultimate recovery.

## 2. *Application of the Public Disclosure Prong of the Jurisdictional Bar*

We turn now to the case at hand and apply the first prong of the public disclosure test to assess whether Findley's complaint is "based upon" the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or GAO report, hearing, audit, or investigation, or in the news media. *See* 31 U.S.C. § 3730(e)(4)(A). The district court relied upon a 1952 Comptroller General Opinion, legislative history of the Randolph–Sheppard Act, 20 U.S.C. §§ 107–107f, and an opinion of the Federal Circuit as evidence that the material componentsof the relator's suit were already publicly disclosed. The1952 Comptroller General Opinion in *Vending Machines,*B–112,840, 32 Comp. Gen. 282 (1952), was the result of a GAO hearing concerning the propriety of post office employees' clubs retaining profits received from vending machines on government premises.

The Comptroller General recognized that "contractual arrangements for the installment purchase, installation, and operation of vending machines at various post offices were made by various postal employee groups with administrative approval, and with the understanding that any proceeds received by the employee groups from the operation of the machines could be retained by them." *Id.* at 284. Even though "the legal authority of the administrative officials to have agreed to such an arrangement is doubtful," the Comptroller General decided not to stop the practice. *Id.* (citing B–111,-086, 32 Comp. Gen. 124 (1952) (advising that vending machine income at the Federal Bureau of Investigation was received "for the use of the United States")).

In 1974, during the process of amending the Randolph–Sheppard Act, the issue arose again. The Senate Report on those amendments recognizes that

[f]ederal employee welfare and recreation groups have for many years depended for their activities on income derived from vending machines on Federal Property.... Blind organization representatives strongly object to the retention of this income by employee groups, stating that vending machines operated by or for such groups compete with blind vending facilities and pose serious threats to the livelihood of blind vendors. Further, they say, federal law and opinions of the Comptroller General support the position that such income may not legally accrue to such groups—their operation is not provided for in statutes, and the income constitutes miscellaneous receipts which by law must be returned to the U.S. Treasury.

S.REP. No. 93–937, 93d Cong., 2d Sess., at 22 (1974). Congress resolved these concerns by changing the Randolph–Sheppard Act to grant priority, rather than preference, to blind persons operating vending facilities.

---

ting *qui tam* suits based upon information known by the government but not the public, however, would discourage lackadaisical law enforcement. Once allegations of fraud or fraudulent transactions are revealed to members of the public, "the government can no longer throw a cloak of se-

crecy around the allegations...." *Id.* Public pressure then will lead to the prosecution of important cases and the jurisdictional bar will prevent relators from interfering with the government's interest if there is a legitimate reason to delay the prosecution.

The Federal Circuit decision in *Texas State Comm'n for the Blind v. United States,* 796 F.2d 400, 402–03 (Fed.Cir.1986) (en banc), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987), resulted from an appeal from a judgment of the United States Claims Court which upheld the decision of·an arbitration panel convened by the Department of Health, Education and Welfare, concerning the exemption of military exchanges from provisions of the Randolph–Sheppard Act. In its opinion the court reviewed the historic tension between the Randolph–Sheppard Act, which provides blind persons with remunerative employment opportunities by permitting them to operate vending stands in federal buildings, and the practice of allowing federal employee organizations to utilize federal property free of charge for similar purposes and to retain the funds. The court's review reveals a history of GAO and congressional inaction despite an awareness of the questioned legality of the employee groups' retention of funds and the fact that competition with the blind weakened the effectiveness of the Randolph–Sheppard Act. *Id.* We agree with the district court that these sources constitute public disclosures of the type contemplated by the FCA. *Cf. United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d at 653 (publicly filed discovery materials constitute public disclosures in a civil hearing); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d at 1155 ("hearing" construed broadly to include allegations and discovery disclosed in connection with civil, criminal or administrative litigation).[5]

Determining that the opinions and legislative history constitute public disclosures, however, does not end the inquiry. We still must determine whether Findley's suit was "based upon ... allegations or transactions" described in these public disclosures. The district court found that the jurisdictional bar was triggered by these disclosures because the information in the public domain was sufficient to enable the government to bring suit against the FPC–Boron Employees' Club without Findley's involvement. As we explained in *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d at 654, "*qui tam* actions are barred only when enough information exists in the public domain to expose the fraudulent transaction ... or the allegation of fraud...."

Findley insists that the assertions detailed in his complaint address different allegations or transactions than those already in the public domain and points out that none of the public disclosures claims that vending machine income is being detoured in violation of the Competition in Contracting Act, 41 U.S.C..§ 253 *et seq.,* the Randolph–Sheppard Act, 20 U.S.C. §§ 107–107f, and various other federal regulations and criminal prohibitions. He analogizes his identification of the BOP employees' organizations with that of an individual blowing the whistle on specific defense contractor overcharges, and warns that a subject matter public disclosure bar based on the occurrence of numerous congressional hearings concerning generic defense contractor fraud would frustrate the purpose of the *qui tam* provisions by foreclosing suits by whistleblowers who have identified specific instances of fraudulent conduct.

We acknowledge that "Congress did not prescribe by mathematical formulae the quantum or centrality of nonpublic information that must be in the hands of the *qui tam* relator in order for suits to proceed." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d at 653. Nevertheless, it is our task to ensure that "*qui tam* suits are limited to those in which the relator has contributed significant independent information...." *Id.* The Act triggers the juris-

---

5. The Employees' Club also relies on the existence of a BOP Program Statement and Institutional Supplement issued by the United States Department of Justice. The sparse record before us discloses few facts concerning the public availability of these documents, and the United States Supreme Court has set for argument a case that will address the application of the "public disclosure" prong of the jurisdictional test when information is "potentially" available under the Freedom of Information Act, 5 U.S.C. § 552, but has not been actually disclosed. *See United States ex rel. Schumer v. Hughes Aircraft,* 63 F.3d 1512 (9th Cir.1995), *cert. granted,* —— U.S. ——, 117 S.Ct. 293, 136 L.Ed.2d 212 (1996). In any case, the resolution of whether these documents are public disclosures within the meaning of the FCA would not affect the outcome of this case, so there is no need for us to · discuss them further.

dictional bar only when there has been a public disclosure of "allegations or transactions," which it explicitly refers to in the disjunctive. *United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d at 552 n. 2. The term " 'allegation' connotes a conclusory statement implying the existence of provable supporting facts." *Id.* at 653–54 (citation omitted). The term " 'transaction' suggests an exchange between two parties or things that reciprocally affect or influence one another." *Id.* at 654. We illustrated the meaning of these terms in *Springfield Terminal*, 14 F.3d at 654, with the following equation: X (misrepresented state of facts) + Y (true state of facts) = Z (fraud). X and Y represent the material elements of fraud; "a *qui tam* action cannot be sustained where all of the material elements of the fraudulent transaction are already in the public domain...." *Id.* at 655. When the publicly disclosed transaction is sufficient to raise the inference of fraud (X + Y are in the public domain), there is "little need for *qui tam* actions, which tend to be suits that the government presumably has chosen not to pursue or which might decrease the government's recovery in suits it has chosen to pursue." *Id.* at 654.

Each of the public disclosures that we rely on raises the specter of "foul play" by acknowledging the questionable legality of permitting federal employees to use federal facilities for the provision of vending services and retaining revenue from such services. *Cf. United States ex rel. Rabushka v. Crane Co.*, 40 F.3d at 1512–13 (public disclosures gave no hint of wrongdoing); *United States ex rel. Mikes v. Straus*, 931 F.Supp. 248 (S.D.N.Y.1996) (public disclosures contain no allegation of fraud and refer to a different type of transaction than the *qui tam* suit). The disclosures recognize that the practice occurs throughout the federal government, thus their relevance cannot be confined to specific agencies. On the other hand, unlike in the defense industry example, the public disclosures here specifically identify the nature of the fraud—illegal retention of monies owed to the government and unauthorized administrative approval of the practice—as well as the federal employee actors engaged in the allegedly fraudulent activity. Little

similarity exists between combing through the myriad of transactions performed by the various defense contractors in search of fraud and finding easily identifiable federal employee organizations that provide vending services on federal property. *Compare United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 572 (10th Cir.1995) (applying jurisdictional bar to disclosure of fraud by specific Department of Energy laboratory after public disclosure of same fraud by other Department of Energy laboratories in GAO hearing because the entities and transactions were easily identifiable) *with Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562 (11th Cir.1994) (GAO report discussing widespread Medicare Secondary Payer Fraud which does not mention Blue Cross Blue Shield is not sufficient to trigger the jurisdictional bar). In this case, we have no trouble in finding enough information in the public domain to identify the employees' groups' allegedly fraudulent transactions.

Our reading of Findley's complaint reveals allegations which substantially repeat what the public already knows and add only the identity of particular employees' clubs engaged in the questionable and previously documented generic practice. In relevant part, Findley's complaint states:

The actions of the Employee Organizations in obtaining vending machine income from BOP facilities, and in retaining that income, constitute violations of the provisions of 31 U.S.C. §§ 3729(a)(1–7) (1988). The Employee Organizations have possession, custody and control of money to be used by the Government and, intending to defraud the Government or willfully to conceal the property, they have delivered, or caused to be delivered, less money than the amount due. They have knowingly obtained public property from officers and employees of the Government who may not lawfully provide that property. They have knowingly made, used, or caused to be made or used, false records and statements to conceal, avoid or decrease an obligation to pay or transmit money to the Government. The Employee Organizations have presented the Government with numerous false and fraudulent records and

statements in which the Employee Organizations falsely and knowingly claim a right to money or property of the Government, including records and statements relating to the receipts obtained by the Employee Organizations. Financial documents provided by the Employee Organizations to the BOP, and required to be provided by the Program Statement, knowingly and falsely reflect that the Employee Organizations are entitled to retain income received from vending machines at BOP facilities, when in fact the Employee Organizations are not entitled to retain any of the vending machine income.

Complaint at ¶ 18. Findley's conclusory allegations offer at best collateral information; they do not introduce elements of new wrongful transactions or material elements to the publicly disclosed transaction.

 Findley's insistence that his claim survives because the public disclosures do not allege violations of the particular federal statutes listed in his complaint is without merit. A relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed. "[T]he relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation." *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d at 1160. If a relator merely uses his or her unique expertise or training to conclude that the material elements already in the public domain constitute a false claim, then a *qui tam* action cannot proceed. *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d at 655; *see United States ex rel. Fine v. Sandia Corp.,* 70 F.3d at 572 (different legal theories do not redeem a complaint based on publicly disclosed transactions).

 We conclude, therefore, that because relator Findley's complaint merely echoes

publicly disclosed, allegedly fraudulent transactions that already enable the government to adequately investigate the case and to make a decision whether to prosecute, the public disclosure bar applies. Accordingly, we move on to the second part of the jurisdictional test, which would permit an exception to the jurisdictional bar if Findley was an "original source" of the "information on which the allegations are based."

### B.

The second part of the jurisdictional test, which permits an exception to the public disclosure bar whenever the relator is an "original source of the information," was a significant feature of the 1986 amendment of the FCA because, as discussed above, it was precipitated by cases that barred *qui tam* suits brought by individuals who first disclosed information concerning fraud to the government. *See United States ex rel. Stinson, Lyons, Gerlin & Bustamante v. Prudential Ins. Co.,* 944 F.2d at 1160. After conflating the public disclosure and original source inquiries, the district court determined that relator Findley was not an original source "[b]ecause the information that relators bring has been a subject of discussion in Congress, in the GAO, and in the Federal courts over the past forty years, as well as appearing in publicly available BOP documents, relators cannot be considered to possess the 'independent knowledge' necessary to be an 'original source.'" *United States ex rel. Findley v. FPC–Boron Employees' Club,* No. 94–1477, slip op. at 9.[6] We agree with the district court's ultimate conclusion, but for different reasons.

#### 1. *Prior Judicial Interpretations of the "Original Source" Exception*

The jurisdictional test permits a relator whose complaint echoes allegations or transactions in the public domain to nonetheless proceed with the suit if she "is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). Subparagraph (B) of the

---

**6.** The court's reference to "publicly available BOP documents" may be a reference to the BOP Program Statement and Institutional Supple-

ment. As noted above, we do not rely on these documents as public disclosures.

provision states that an "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing an action...." 31 U.S.C. § 3730(e)(4)(B). As with the "public disclosure" prong, courts addressing the "original source" prong of the jurisdictional bar have interpreted it in varying ways.

The Second and Ninth Circuits have construed the original source provision as limited to whistleblowers who, in addition to having direct and independent knowledge of the information that was publicly disclosed, had a hand in the specific public disclosure. *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16–18 (2d Cir. 1990); *Wang v. FMC Corp.*, 975 F.2d at 1417–20. The Second Circuit conducted an analysis that was heavily influenced by statements in the Act's legislative history evidencing a congressional intent to spur informers to come forward at an early date. The court reasoned that the word "information" in subparagraph (A) refers to information publicly disclosed, whereas "information" in subparagraph (B) refers to the information that supplies the basis for the *qui tam* action itself. Then, because the court determined that Congress must have intended the phrase "original source of the *information*" from subparagraph (A) to refer to different *information* than the phrases "direct and independent knowledge of the *information*" and "voluntarily provided the *information*" which are included in subparagraph (B), the Second Circuit determined that subparagraph (A) stated an additional criterion that an "original source" must meet. *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d at 16–18. The court concluded that the "most natural reading" of the Act indicated that in order to qualify as an original source, a *qui tam* relator must (1) have "direct and independent knowledge of the information on which the allegations are based," (2) "voluntarily provide[ ] that information to the Government," and, in addition, (3) "have directly or indirectly been a source to the entity that

publicly disclosed the allegations on which a suit is based." *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d at 16–17.

The Ninth Circuit agreed with the Second Circuit, but because the court found the text of the statute unclear, the court explicitly based its decision on the history and purpose of the FCA. *Wang v. FMC*, 975 F.2d at 1419; *see also United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d at 1154 (relying on the principal "intent" of the FCA in order to understand the meaning of the "original source" exception).[7]

The Fourth Circuit criticized these approaches in *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d at 1350–55, as imposing an extra textual requirement, not intended by Congress, that requires a relator to be a source of the public disclosures. Instead, the court adopted an interpretation of the exemption that relies on the provision's subparagraph (B) description of "original source" without any consideration of how it relates to subparagraph (A), which actually announces the exemption to the public disclosure jurisdictional bar. According to the Fourth Circuit, after there has been a public disclosure that triggers the jurisdictional bar, meaning that an individual derived his knowledge of fraud from a public disclosure, that individual can still be an original source so long as he obtains direct information independently, *i.e.*, not from the public disclosure, and voluntarily provides it to the government. We have already questioned the logic of this approach. While we agree with the Fourth Circuit that the exemption is not limited to individuals who were original sources to the entity that publicly disclosed the fraud, we do not adopt the entirety of the Fourth Circuit's "original source" construction either because it too fails to harmonize subparagraph (B) with subparagraph (A), each of which we find to be a necessary component of the exception.

### 2. The Meaning of the "Original Source" Exception

Section 3730(e)(4)(A) of the FCA provides that "[n]o court shall have jurisdiction over

---

**7.** In *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d at 657 n. 12, we explicitly declined to address whether the *qui tam* plaintiff must itself have had a hand in the public disclosure that triggers the jurisdictional bar.

an action ... based upon the public disclosure of allegations or transactions ... unless ... the person bringing the action is an original source of the information." Read by itself, subparagraph (A) suggests that the exemption to the jurisdictional bar applies when a relator initially exposed information that was later publicly disclosed. The ambiguity that has led to disagreement among the circuits is caused by the description of an "original source" in subparagraph (B). It states that an "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action...." 31 U.S.C. § 3730(e)(4)(B). Standing on its own, subparagraph (B) suggests that an "original source" need only have direct and independent knowledge of the allegations in the *qui tam* complaint. The two subparagraphs must be read together, however, in order to divine Congress' real intent.

■ We have already decided that the public disclosure bar is triggered when a relator files an action that is substantially similar to "allegations or transactions" already in the public domain. The relator may pursue her suit, however, if she is an "original source of the information." 31 U.S.C. § 3730(e)(4)(A). The word "information" refers to "*any* essential element of the fraud transaction (e.g., Y)." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d at 657. Subparagraph (B) explicates the meaning of "original source."

■■ Subparagraph (B) requires that an "original source" have "direct and independent knowledge of the information on which the allegations are based...." In order to be "direct," the information must be first-hand knowledge. In order to be "independent," the information known by the relator cannot depend or rely on the public disclosures. *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d at 657. Therefore, a person who learns of fraud from a public disclosure can never be an "original source."

■■ "[T]he allegations" referred to in subparagraph (B) can only mean those allegations publicly disclosed, since those are the only allegations mentioned at all in section 3730(e)(4). *See Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 608–09, 76 L.Ed. 1204 (1932) (identical words used in different parts of the same statutory section are intended to have the same meaning); *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d at 1352. Thus, an "original source" is a relator with direct and independent knowledge of "the information [*i.e.*, any essential element of the fraud transaction] on which the [publicly disclosed] allegations are based...." Relator Findley cannot meet this requirement because, however much direct and independent knowledge he may have of the information in his complaint, he does not have direct and independent knowledge of the information on which the publicly disclosed allegations are based.

■ We agree with the Fourth Circuit, however, that there is no additional requirement that the "original source" be responsible for providing the information to the entity that publicly disclosed the allegations of fraud. To qualify as an "original source," a relator must also have "voluntarily provided the information to the government" before filing a *qui tam* suit which is "based on the information." 31 U.S.C. § 3730(e)(4)(B). Significantly, the statute only contemplates an "original source" being a "source" to the government. A person who provided information to the government that subsequently was uncovered by a reporter and printed in the newspaper, would still be able to maintain a *qui tam* action.

■ We differ from the Fourth Circuit in one respect, however. It is clear to us that an "original source" must provide the government with the information prior to any public disclosure. We previously noted that the government notice part of the "original source" exception may appear extraneous in light of the statute's filing provisions, which require cases to be filed under seal for a period of at least sixty days and served only on the government. The "original source" government notification provision is not su-

perfluous, however, for it serves an entirely different purpose from the statute's filing and government notice provisions. By protecting a party who initially exposes fraud to the government, Congress "corrected" the holding of *United States ex rel. Wisconsin v. Dean.* Once the information has been publicly disclosed, however, there is little need for the incentive provided by a *qui tam* action. Thus, the only reading of the statute that accounts for the requirement that an "original source" voluntarily provide information to the government before filing suit, and Congress' decision to use the term "original source" rather than simply incorporating subparagraph (B)'s description into subparagraph (A), is one that requires an original source to provide the information to the government prior to any public disclosure.

▆ In this case, relator Findley has stated that he was unaware of the public disclosures that we relied on in determining that the jurisdictional bar has been triggered and that he learned of the practices of the FPC–Boron Employees' Club when he attended a conference at FPC–Boron. Because the employees' groups' questionable transactions were publicly disclosed in a manner recognized by the FCA before Findley even became aware of the practices, he cannot qualify as an original source who is exposing essential elements of a fraudulent transaction that have not previously been publicly disclosed.

### IV. CONCLUSION

▆ The FCA's jurisdictional bar against *qui tam* actions "based upon the public disclosure of allegations or transactions" applies in a suit such as this one, where the information in the public domain at the time the FCA suit was brought was sufficient to enable the government to adequately investigate the case and to make a decision whether to prosecute. Relator Findley cannot qualify as an "original source" because he had no knowledge of any of the essential elements of the publicly disclosed fraudulent transactions prior to their public disclosure. Accordingly, we affirm the district court's dismissal of this action.

*So ordered.*

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

## ORDER

March 18, 1997.

PER CURIAM.

Appellant petitions for rehearing on the narrow ground that the court failed to address an allegation in his complaint that Bureau of Prisons' ("BOP") employees' clubs violated a BOP program statement by taking 100 percent of the revenues received from vending machines within prison facilities when the program statement only permitted them to retain 85 percent of the revenues. The portion of his complaint that refers to violations of the program statement does so only in the most general terms, with a particularized allegation only that the employees' clubs did not follow regulations for the procurement of vending machine services from outside vendors. Since appellant's complaint and his briefs on appeal fail to give adequate notice of the claim that he now advances, the petition for rehearing is denied.