**UNITED STATES of America, ex rel.
Kevin COSENS, Plaintiff,**

v.

**YALE–NEW HAVEN HOSPITAL,
Defendant.**

No. 3:02CV688(GLG).

United States District Court,
D. Connecticut.

Nov. 14, 2002.

Mary Alice Leonhardt, Hartford, CT, Phillip E. Benson, Anaheim, CA, William Keller McInerney, Jr., Seattle, WA, Donald R. Warren, Warren Benson Law Group, San Diego, CA, John B. Hughes, Richard M. Molot, U.S. Attorney's Office, New Haven, CT, Brian C. Kipnis, David R.

Jennings, U.S. Attorney's Office, Seattle, WA, David T. Cohen, Department of Justice Commercial Litigation Branch, Washington, DC, for Plaintiff.

Jonathan D. Elliot, Kleban & Samor, PC, Southport, CT, Leonard C. Homer, Ray M. Shepard, Ober, Kaler, Grimes, and Shriver, Baltimore, MD, Stephen Damian Rose, Michael P. Ruark, Adam G. Snyder, Inslee, Best Doezie & Ryder, Bellevue, WA, Martha Purcell Rogers, Attorney, Ober, Kaler, Grimes & Shriver, Washington, DC, for Defendant.

### OPINION

GOETTEL, District Judge.

Defendant, Yale–New Haven Hospital ("Yale"), has moved this Court to dismiss this action for lack of subject matter jurisdiction pursuant to Rules 12(b)(1) and 12(h)(3), Fed.R.Civ.P. [**Doc. # 190**]. Yale asserts that this Court lacks subject matter jurisdiction under § 3730(e)(4) of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–33, because the allegations in the complaint are based upon substantially identical allegations publicly disclosed before the *qui tam* complaint was filed and because the Relator, Kevin Cosens, is not the "original source" of the information.

### I. Legal Standard for Ruling on a Motion to Dismiss

In evaluating a motion to dismiss pursuant to Rule 12(b)(1), Fed.R.Civ.P., this Court must first determine whether it is confronted with a facial or factual challenge to its jurisdiction. *See Gould Elecs., Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000); *2 Moore's Federal Practice,* § 12.30[4] (2002 3d ed.). In this case, the jurisdictional challenge raised by Yale unquestionably is factual in nature. The Relator has alleged in his complaint that he is the original source of the information set forth therein, that there has been no prior public disclosure, and that if such public disclosure has occurred, he was the original source of such allegations. (Compl.¶ 142.) Yale does not challenge the sufficiency of the pleadings in this regard. Rather, it contests on a factual basis the failure of the Relator's jurisdictional claims to comply with the requirements set forth in 31 U.S.C. § 3730(e)(4) of the FCA.

Because Yale's jurisdictional challenge is factual in nature, our consideration of this motion is not limited to the face of the complaint. *Robinson v. Government of Malaysia,* 269 F.3d 133, 141 (2d Cir.2001); *2 Moore's* at § 12.30[4]. Instead, the Court may consider and weigh evidence outside the pleadings to determine if it has jurisdiction. *Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 932 (2d Cir.1998); *see also Robinson,* 269 F.3d at 141 (holding that, if the resolution of a factual issue is necessary for a ruling on a motion to dismiss, the court *must* go beyond the pleadings and resolve any disputed issues of fact).

Once the defendant challenges the factual basis of the plaintiff's claim of subject matter jurisdiction, the plaintiff bears the burden of going forward with evidence demonstrating the existence of federal subject matter jurisdiction over his complaint. *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994); *Fisher v. Federal Bureau of Investigation,* 94 F.Supp.2d 213, 215 (D.Conn.2000).

### II. Procedural Background

On March 31, 1994, Relator Kevin Cosens, a private citizen who served as a sales representative and clinical support person for cadiovascular device manufacturers, filed a *qui tam* action under the FCA in the United States District Court for the Western District of Washington. His complaint alleged that Yale–New Haven Hospital and 131 other clinical trial

hospitals had fraudulently billed Medicare and other federal health care programs for medical procedures and related services involving investigational or experimental cardiac devices, which were not covered under Medicare or other applicable programs. The cardiac devices included over 57 different types and models of atherectomy devices, lasers, stents, prosthetic cardiac valves, pacemakers and pacemaker leads, automatic implantable cardiac defibrillators and leads, ablation catheters, angioplasty devices, balloon valvuloplasty devices, and vascular grafts.

On April 4, 2002, the action against Yale was severed and transferred to the District of Connecticut.

Prior to this transfer, nine of the original defendants, including Yale, filed in the Western District of Washington a motion to dismiss for lack of subject matter jurisdiction, raising the same arguments now presented in the instant motion. On March 6, 2002, Judge Robert S. Lasnik declined to rule on the motion and ordered it stricken on the ground that the motion was premature, since the Relator could decide to amend his complaint before service or not pursue the case altogether. (Order Regarding Motions to Dismiss and to Preclude Government Intervention at 6, Case No. C94–474L (W.D.Wash. Mar. 6, 2002)).

On June 27, 2002, Yale filed the instant motion. Following a full briefing, including the submission of affidavits and other supporting evidence by all parties, the Court heard oral argument of counsel on September 5, 2002. No additional evidence was presented at this hearing.

On August 15, 2002, the United States filed its notice of intention to intervene, but to date has not filed an amended complaint in this action.

On September 30, 2002, the United States and Relator Cosens filed with the United States Judicial Panel on Multidistrict Litigation a joint motion to transfer this case and 38 other cases, pending in 27 federal districts, to the Western District of Washington for coordinated or consolidated pretrial proceedings, pursuant to 28 U.S.C. § 1407. That motion has not yet been ruled upon. In the meantime, this Court's jurisdiction continues until any transfer ruling becomes effective. With respect to pending motions, the Court has been encouraged by the Multidistrict Litigation Panel to rule these motions, "unless the motion raises issues likely to arise in other actions in the transferee court, should [they] order transfer, and would best be decided there."[1] (Letter from Hon. Wm. Terrell Hodges to All Involved Judges of 10/11/02.) Because the motion to transfer this case to Multidistrict Litigation is for pretrial purposes only, and because the pending motion to dismiss concerns our very power to hear this case and, as discussed below, is somewhat dependent on the facts of this specific case, we will proceed with a decision on this motion.

### III. Subject Matter Jurisdiction Under the FCA

Under the FCA, a private party may maintain a *qui tam* action based on publicly disclosed allegations of fraud or fraudulent transactions only if the party qualifies as "an original source of th[is] information." 31 U.S.C. § 3730(e)(4)(A); *United States ex rel. Kreindler & Kreindler v.*

---

1. The Court is aware that a similar motion has been filed by defendant-hospitals in several other cases pending in five other districts. (Mot. to Transfer at 10.) Plaintiffs have argued that transfer of these actions to a single court for pretrial purposes is necessary to avoid possibly inconsistent decisions on this and other motions. (Brief in Support of Mot. to Transfer at 14–17.)

*United Technologies Corp.,* 985 F.2d 1148, 1157 (2d Cir.), *cert. denied,* 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993). Section 3730(e)(4)(A) restricts the subject matter jurisdiction of a court over private-plaintiff suits in the following manner:

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

The statute then defines "original source" as

an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(B). This section, which was added by the 1986 amendments to the FCA, attempts to "strike a balance between encouraging private citizens to expose fraud and avoiding parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud." *United States ex rel. Doe v. John Doe Corp.,* 960 F.2d 318, 321 (2d Cir.1992) (discussing history of the 1986 amendments); *United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 679–81 (D.C.Cir.1997) (discussing the development of the public disclosure bar).[2]

Section 3730(e)(4) creates a two-part test. First this Court must determine whether the allegations or transactions on which the *qui tam* action is based were publicly disclosed in one of the ways listed in the statute. *Doe,* 960 F.2d at 323. Second, if the Court determines that the relator's claim is based upon allegations or transactions that were publicly disclosed in a manner set forth in § 3730(e)(4)(A), then the Court must consider whether the relator qualifies as an "original source." *Id.* at 322, n. 3.

With respect to the first issue, in order to qualify as a "public disclosure," there must have been (1) a "public" disclosure (2) of "transactions or allegations" (3) in a "criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media," and (4) the relator's action must be "based upon" that public disclosure. *Id.* at 322–34. "If and only if there has been such a public disclosure," do we then inquire into whether the relator is the "original source," within the meaning of § 3730(e)(4)(B). *A–1 Ambulance Serv., Inc. v. California,* 202 F.3d 1238, 1243 (9th Cir.), *cert. denied,* 529 U.S. 1099, 120 S.Ct. 1833, 146 L.Ed.2d 777 (2000).

To qualify as an "original source," a relator must have (1) had direct and independent knowledge of the information on which the allegations are based, (2) voluntarily provided such information to the Government prior to filing suit, and (3)

---

**2.** As noted by the Court in *Findley,*

[p]redictably, these jurisdictional provisions ... have led to extensive litigation and to circuit splits concerning the meaning of the words "based upon," "public disclosure," "allegations or transactions," "original source," "direct and independent knowledge" and "information." Virtually every

court of appeals that has considered the public disclosure bar explicitly or implicitly agrees on one thing, however: the language of the statute is not so plain as to clearly describe which cases Congress intended to bar.

105 F.3d at 681.

directly or indirectly been a source to the entity that publicly disclosed the allegations on which the suit is based. 31 U.S.C. § 3730(e)(4)(B); *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir.1990); *Kreindler & Kreindler*, 985 F.2d at 1159.

### IV. Factual Background

In its motion to dismiss for lack of subject matter jurisdiction, Yale contends that there was a public disclosure by one Robert Farrell Maier, who was the Director of the Business Office for the Baptist Medical Center in Oklahoma City, Oklahoma, prior to Relator Cosens' filing this *qui tam* action in the Western District of Washington.

According to the sworn testimony of Mr. Maier, in 1991, he received a telephone call from the Director of Radiology at his hospital seeking approval to purchase a non-FDA-approved cardiac defibrillator that a surgeon intended to implant in a Medicare patient. (Decl. of Maier dtd. 5/13/02 at ¶ 2.) Mr. Maier advised him that Medicare would not reimburse the hospital for the costs of this procedure and, therefore, denied the request. (*Id.* at ¶ 2.) The radiologist then spoke with a salesman[3] for the device at issue, who related that some other hospitals were billing and being paid for the investigational defibrillator model in question. (*Id.* at ¶ 3.) This information was related to Mr. Maier. (*Id.*) Shortly thereafter, the cardiac surgeon who had requested this device contacted Mr. Maier and told him that he had spoken to the manufacturer's representative, who stated that he thought the investigational device was covered by Medicare. The manufacturer's representative told him that he had sold similar devices all over the country and knew that other hospitals were billing Medicare for them and were being paid. (*Id.* at ¶ 4; Add'l Decl. of Maier dtd. 7/12/02 at ¶ 3.) Mr. Maier states:

> When the surgeon told me that the manufacturer's representative said some other hospitals were billing and being paid for the investigational defibrillator model in question, I was not told any details of how the hospitals were billing. I was not told, and had no information, that the unnamed hospitals were billing fraudulently. The salesman did not state the hospitals were misrepresenting anything to Medicare. To the contrary, the salesman stated he thought the investigational defibrillator being billed by the unnamed hospitals was covered by Medicare.

(Add'l Decl. of Maier at ¶ 3.) Mr. Maier then passed on this information to a Medicare fiscal intermediary, who confirmed that this device was not covered by Medicare. (Decl. of Maier at ¶¶ 5, 6.) In early 1992, Mr. Maier also discussed this matter with a Medicare auditor, who was visiting the hospital on another matter, and subsequently with a Medicare investigator from the Dallas Regional Medicare Office. (*Id.* at ¶¶ 8, 9.) He later spoke with another Medicare investigator and suggested that it would be easy to investigate this matter by obtaining records from the manufacturers as to whom they had sold these de-

---

**3.** To the extent that Mr. Maier, in his first declaration, identified Relator Cosens as the salesperson or sales representative, those statements have been expressly retracted by him. (Add'l Decl. of Maier at ¶ 2.) Maier admits that he has no recollection of the name "Kevin Cosens." *Id.* That name "was suggested and inserted by the attorney who prepared the declaration." *Id.* On August 5, 2002, Maier signed an amended declaration, which omits all references to Cosens. Additionally, Relator Cosens has provided a sworn declaration dated July 15, 2002, in which he states that he was not even in the defibrillator business in 1991, when these conversations with doctors from Baptist Medical Center reportedly took place.

vices. (*Id.* at ¶ 10.) He did not, however, provide to the fiscal intermediary, the Medicare auditor or investigators any information as to what the hospitals were stating in their bills, as he had no information in this regard, and he did not make any statements that the hospitals were billing fraudulently or misrepresenting their bills. (Add'l Decl. of Maier at ¶ 3.) He also did not mention any experimental devices other than the specific model about which he was concerned. (*Id.* at ¶ 4.) These events transpired in 1991 and 1992. Mr. Maier heard nothing further from anyone at Medicare on this issue until 1995 when he was contacted to testify before a Senate Subcommittee investigating improper Medicare billings. (Decl. of Maier at ¶ 12.)

On March 25, 1993, Relator Cosens spoke with a Medicare fiscal intermediary about a single billing statement for an investigational device used at a hospital in Seattle, Washington. Cosens told her that billing for investigational devices was not an isolated incident but was widespread throughout the nation, and he named four hospitals in Washington that followed such practices. (Decl. of Cosens dtd. 2/3/02 at ¶ 6.) He estimated that in the state of Washington alone, those hospitals had billed Medicare millions of dollars for surgical procedures involving unapproved medical devices, including pacemakers, defibrillators, and other cardiac devices. (*Id.*) The intermediary indicated that she would look into this. (*Id.*) In a later conversation, the fiscal intermediary and an

agent from the Inspector General's Office of Health and Human Services ("HHS") confirmed that the intermediary was reviewing only the one hospital bill until Cosens volunteered information about the widespread practice. (*Id.* at ¶ 7.) Thomas Ault, who was with the Health Care Financing Administration ("HCFA"), testified that it was this fiscal intermediary who brought this matter to their attention in April of 1993. (Ault Testimony, S. Hrg. 104–520 Tr.[4] at 46.)

In 1993, the HCFA contacted the Office of the Inspector General of HHS with concerns that several hospitals had improperly billed Medicare for surgical procedures involving unapproved cardiac devices. (Hartwig Testimony, S. Hrg. 104–520 Tr. at 25, 29; Ault Testimony, S. Hrg. 104–520 Tr. at 47.) In October, 1993, subpoenas were issued to five manufacturers of the investigational devices. (Hartwig Testimony, S. Hrg. 104–520 Tr. at 38.) That fall, the Office of Inspector General contacted Relator Cosens concerning his knowledge of experimental device billing fraud by clinical trial hospitals throughout the country. (Decl. of Cosens at ¶ 8.) The government agent indicated that they had been unable to identify which hospitals were billing Medicare for these investigational devices, and that they needed an insider who could obtain this information for them. (*Id.*) During the latter part of 1993 and early 1994, Cosens provided the Government with additional information concerning the billing practices of various

---

**4.** "S. Hrg. 104–520 Tr." refers to the transcript of the Hearing on "Improper Medicare Billing by Hospitals Nationwide for Investigational Devices and Procedures," before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, United States Senate, 104th Cong., 2d Sess., Feb. 14, 1996. Witnesses testifying included an anonymous industry witness (Relator Cosens); John E. Hartwig, the Deputy Inspector General for Investigations, Department of Health and Human Services; Thomas Ault, Director, Bureau of Policy Development, Health Care Financing Administration; Farrell Maier, Hospital Billing Executive; Patrick E. Fry, Chief Executive Officer, Sutter Community Hospitals; Dennis Stillman, Associate Administrator for Finance, University of Washington Medical Center; and Anthony M. Sanzo, President and Chief Executive Officer, Allegheny General Hospital.

hospitals, including Yale, for investigational devices. (*Id.* at ¶ 10.) He also provided the Government with the names of five specific device manufacturers and the specific devices that he had determined were being improperly billed by the hospitals. (*Id.* at ¶ 11.) This information, Cosens states, was used by the government in issuing subpoenas to various hospitals in January, 1994. Prior to filing this *qui tam* action, however, he did not see the subpoenas nor the documents obtained as a result of the subpoenas. (*Id.* at ¶ 12.) Cosens states that through his investigation he identified over 100 hospitals that he believed were wrongfully billing for at least 57 different investigational devices. (*Id.* at ¶ 15.) On March 31, 1994, Cosens filed his *qui tam* action in the Western District of Washington.

## V. Discussion

### A. Is this Motion Premature?

Initially, the Relator and United States argue that this motion is premature and should be denied on that basis. First, they assert that the filing of this motion is in violation of Judge Lasnik's order, since the United States has not yet filed its amended complaint and Yale has not yet been served.[5] Secondly, they assert that, because discovery has not commenced and the Relator has not been able to engage in discovery to test the veracity of the affidavits submitted by Yale in support of its motion, the motion should be denied as premature.

■ As argued by Yale, the issue of subject matter jurisdiction may be raised at any time. *See* Rule 12(h)(3), Fed.R.Civ. P.; *2 Moore's* at § 12.30[1]; *Maryland*

*Casualty Co. v. W.R. Grace and Co.*, 23 F.3d 617, 621 (2d Cir.), *cert. denied*, 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 559 (1994). The Government has filed a notice of its intention to intervene and has represented that its amended complaint will state the same basic claim as those asserted by Relator Cosens in his *qui tam* action. We note that the amended complaints filed to date in other jurisdictions against other hospitals have mirrored the *qui tam* complaint. Additionally, as discussed below, our ruling on this motion affects only our jurisdiction over the Relator's *qui tam* action and not the action by the Government. Therefore, no purpose will be served by delaying a ruling on this motion until the Government's complaint is filed.

■ The second argument raised by Plaintiffs for postponing a decision on this motion is more problematic. However, it appears that the record in this case has been sufficiently developed to support a decision on the jurisdictional question raised by Yale. There has already been substantial testimony by a number of witnesses before the United States Senate's Permanent Subcommittee on Investigations of the Committee on Governmental Affairs (*see* Note 4, *supra*) and by way of sworn declarations from Farrell Maier, whom Yale claims to be the "original source" of the allegations in this action, as well as from Relator Cosens. Additionally, the Relator obviously has had an opportunity to discuss Mr. Maier's testimony with him, for the Relator has filed an additional declaration from Mr. Maier, correcting and clarifying his first declaration. Moreover, to the extent that the Relator

---

5. As a *qui tam* action, this case is unusual in that the defendants, by virtue of the partial unsealing of the complaint in connection with the *Cedars–Sinai* litigation filed by 25 of the defendants in the Central District of California, were aware that they were defendants and were generally aware of the claims being asserted against them. *See Cedars–Sinai Med. Ctr. v. Shalala*, 125 F.3d 765 (9th Cir.1997); *Cedars–Sinai Med. Ctr. v. Shalala*, 177 F.3d 1126 (9th Cir.1999).

claims to be the "original source" of the information in his complaint, he obviously has personal knowledge of these facts. Therefore, Plaintiffs will not be prejudiced by a ruling on this motion prior to discovery.

The Government also argues that the motion is premature because once the Government intervenes, the case will not be subject to dismissal even if the Relator is dismissed under § 3730(e)(4). (U.S. Opp'n to Mot. to Dismiss at 9.) The Government is correct that its claims are not subject to dismissal, even though those of the Relator are. However, that fact does not render our consideration of this motion premature. "Intervention by the United States into a *qui tam* suit does not automatically endow the court with subject matter jurisdiction over both the claims by the United States and by the relator." *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 798 (10th Cir.2002); *see also Federal Recovery Services, Inc. v. United States*, 72 F.3d 447, 452 (5th Cir.1995) (rejecting a relator's attempt "to end-run the 'original source' inquiry by arguing that the United States' intervention in the action cured any jurisdictional defect"); *Eitel v. United States*, 242 F.3d 381 (Table), 2000 WL 1529237, at *2 (9th Cir.2000) (unpublished disposition) (holding that "[w]hether or not the government proceeds with this action, *Eitel* cannot because he is not an original source"). Thus, despite the Government's notice of its intention to intervene, we must still resolve the question of our subject matter jurisdiction over the Relator's claims.

Yale asserts that, if the Relator's *qui tam* action is dismissed for lack of subject matter jurisdiction under § 3730(e)(4)(A), this Court would also lack jurisdiction over the Government's claims because our jurisdiction is then limited to suits *initiated* by the Attorney General, and this case was not initiated by the Attorney General.[6] We disagree. In *Federal Recovery Services*, the court held that the "United States may properly intervene in a suit by a putative source regardless of jurisdictional failures in the underlying suit." 72 F.3d at 452. *Accord Stone*, 282 F.3d at 798. Thus, even if we were to find subject matter jurisdiction lacking over the *qui tam* claims of the Relator, that would not require us to dismiss the Government's claims as well.[7]

## B. Does the Jurisdictional Bar of § 3730(e)(4)(A) Apply?

Turning to the merits of Yale's jurisdictional challenge, Yale argues that Relator Cosens' claim that Yale had improperly billed federal programs for devices which had not been approved for marketing by the FDA was precisely the same allegation reported in 1991 by Farrell Maier to a Medicare auditor, Medicare investigators, and fiscal intermediary. Thus, it asserts that the *qui tam* action is barred because it is based upon allegations that had been publicly disclosed by Farrell Maier as part of a Medicare investigation, and Relator

---

6. Yale also argues that the Government's claims are barred by the applicable statute of limitations. We do not address that issue at this time.

7. The case of *United States ex rel. Felton v. Allflex USA, Inc.*, 989 F.Supp. 259 (C.I.T. 1997), *appeal dismissed*, 155 F.3d 570, 1998 WL 382623 (Fed.Cir.1998) (Table) (unpublished opinion), cited by Yale, is distinguish-able. In that case, the United States had *declined* to intervene in the *qui tam* action brought by the relator under the FCA. Additionally, the issue presented in that case was whether a *qui tam* action brought by a private plaintiff was considered an action "commenced by the United States" for purposes of conferring jurisdiction on the Court of International Trade, pursuant to 28 U.S.C. § 1582.

Cosens was not the "original source" of that information. Both Relator Cosens and the United States respond that the generic statements by Maier did not amount to a public disclosure of allegedly false claims by Yale. First, Maier had no information about Yale's billing practices. In fact, Maier made no statements whatsoever concerning how *any* hospital, much less Yale, was billing Medicare for investigational defibrillators. Second, he never mentioned any experimental device other than a single, specific defibrillator model that a doctor was attempting to use at Baptist Medical Center in Oklahoma City. Third, Maier never made any statements concerning misrepresentations by any hospital or fraudulent billing practices by any hospital, including Yale.

In analyzing Yale's jurisdictional challenge under § 3730(e)(4)(A), we must first determine whether the communications by Maier were a "public disclosure" of "allegations or transactions" and, if so, whether Relator Cosens' lawsuit was "based upon" that publicly disclosed information. Only if we answer these questions in the affirmative, do we then have to determine whether Relator Cosens was an "original source" of that information under § 3730(e)(4)(B).

### 1. Were Maier's Statements a "Public Disclosure"?

■ The parties' initial arguments focus on the question of whether Maier's statements to the fiscal intermediary and later to the Medicare auditor and investigators were a public disclosure, in other words, whether these statements were placed in the "public domain." *See Doe,* 960 F.2d at 322. We find that, at a minimum, the statements to the Medicare investigators were a "public disclosure." Disclosure of information to a competent public official, whose duties extend to the claim in question, has been held to be a public disclosure within the meaning of § 3730(e)(4)(A).

*United States v. Bank of Farmington,* 166 F.3d 853, 861 (7th Cir.1999); *see also United States ex rel. Dhawan v. New York Medical College,* 252 F.3d 118, 121 (2d Cir.2001) (although not directly addressing the public disclosure question, the Court treated the relators' request that the New York City Health & Hospitals Corporation perform an audit as a public disclosure).

### 2. Was There a Public Disclosure of "Allegations or Transactions"?

■ Turning to the second prong of the public disclosure test, we must determine whether the information disclosed by Maier constituted "allegations or transactions" within the meaning of § 3730(e)(4)(A). In other words, did he disclose "allegations" of fraud or fraudulent "transactions"? *See United States ex rel. Waris v. Staff Builders, Inc.,* No. CIV. A. 96–1969, 1999 WL 788766, at *4 (E.D.Pa. Oct. 4, 1999). Yale contends that Maier's disclosures fell within the ambit of "allegations" because they were "conclusory statement[s] implying the existence of provable supporting facts," citing *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 653–54 (D.C.Cir.1994). Relator Cosens, relying on the same authority, argues that the information provided by Maier was too generic to constitute an "allegation," as that term has been interpreted by the courts. *See Id.*

As one circuit court has observed, the FCA "bars suits based on publicly disclosed 'allegations or transactions,' not information." *United States ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734, 740 (3d Cir.1997) (quoting *Wang v. FMC Corp.,* 975 F.2d 1412, 1418 (9th Cir.1992)). Therefore, "either the allegations of fraud or the elements of the underlying transaction" must be present in the public disclosure in order to invoke the jurisdictional bar. *Id.; see also United States ex rel.*

*Minnesota Ass'n of Nurse Anesthetists v. Allina Health System Corp.,* 276 F.3d 1032, 1044 (8th Cir.2002) (holding that the public disclosure must reveal "both the true state of facts and that the defendant represented the facts to be something other than what they were.").

In the *Springfield Terminal Ry.* case, cited by both sides, the Court analyzed the "allegations or transactions" requirement, and held that an "allegation" of fraud is a "conclusory statement implying the existence of provable supporting facts." 14 F.3d at 653–54. On the other hand, a fraudulent "transaction" is one that discloses the "critical elements" of fraud. *Id.* at 654. The Court offered the following example to illustrate whether a disclosure constitutes an "allegation or transaction" for purposes of § 3730(e)(4)(A):

> [I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent the essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.,* the conclusion that fraud has been committed. The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain.

14 F.3d at 654 (original emphasis). This algebraic equation has been applied by a number of courts. *See, e.g., United States ex rel. Foundation Aiding The Elderly v. Horizon West, Inc.,* 265 F.3d 1011, 1015 (9th Cir., 2001); *cert. denied,* —— U.S. ——, 122 S.Ct. 2292, 152 L.Ed.2d 1050 (2002); *United States ex rel. Settlemire v. District of Columbia,* 198 F.3d 913, 918 (D.C.Cir.1999); *United States v. A.D. Roe Co.,* 186 F.3d 717, 724 (6th Cir.1999); *Dunleavy,* 123 F.3d at 741; *United States ex rel. Rabushka v. Crane Co.,* 40 F.3d 1509,

1522 (8th Cir.1994), *cert. denied,* 515 U.S. 1142, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995); *United States ex rel. Woods v. Empire Blue Cross and Blue Shield,* No. 99 Civ. 4968, 2002 WL 1905899, *5 (S.D.N.Y. Aug. 19, 2002).

Applying this analysis to the facts of this case, it is clear that Maier's statements to the Medicare investigators were neither allegations of fraud nor fraudulent transactions. Maier states under oath that he inquired of the fiscal intermediary whether Medicare would reimburse the hospital for the investigatory medical device at issue (Decl. of Maier at ¶ 5); he told the Medicare auditor that other hospitals were billing Medicare for investigational devices and were being paid (*id.* at ¶ 8); and he related this same information to the Medicare investigators (*id.* at ¶ 10). However, Maier emphatically states that he never made any statements about what the unnamed hospitals were stating in their bills or as to any of the transactional details of how the hospitals were billing. (Add'l Decl. of Maier at ¶ 3.) He also never made any statements that the unnamed hospitals were misrepresenting their bills or committing fraud, as he had no information in that regard. (*Id.*) Thus, Maier clearly made no public allegation of fraudulent billing practices by any hospital, including Yale, nor provided any public disclosure of a fraudulent transaction by any specific hospital, including Yale. To use the illustration provided by the Court in *Springfield Terminal Ry.,* his disclosures, at most, were either "X" or "Y", but not "X + Y" and clearly not "Z." *See United States ex rel. Lindenthal v. General Dynamics Corp.,* 61 F.3d 1402, 1410 (9th Cir. 1995), *cert. denied,* 517 U.S. 1104, 116 S.Ct. 1319, 134 L.Ed.2d 472 (1996); *see also Waris,* 1999 WL 788766, at *5 (holding that the disclosure of billing invoices and

cost reports were neither allegations of fraud nor fraudulent transactions).

Significantly, Maier's statements also did not implicate Yale in any manner whatsoever. The courts have held that while the public disclosures do not need to specifically name the defendant in order for the jurisdictional bar to be raised, the allegations are sufficient if the defendant is directly identifiable from the publicly disclosed information. *See Foundation Aiding the Elderly,* 265 F.3d at 1016; *Findley,* 105 F.3d at 687; *Cooper v. Blue Cross and Blue Shield of Fla., Inc.,* 19 F.3d 562, 566 (11th Cir.1994); *United States ex rel. Fine v. Sandia Corp.,* 70 F.3d 568, 571–72 (10th Cir.1995); *Feingold v. Associated Insur. Cos.,* No. 98 C 4392, 2001 WL 1155250, *7 (N.D.Ill. Sept. 28, 2001). Here, there was no public disclosure by Maier to the Medicare investigators from which Yale could be readily identified. Accordingly, we find that the disclosures by Maier did not rise to the level of "allegations or transactions" so as to prevent our exercise of jurisdiction, pursuant to § 3730(e)(4)(A).

Having found that Maier's disclosures failed to meet the "allegations or transactions" requirement of § 3730(e)(4)(A), we need not address the remaining issue of whether the Relator's *qui tam* action was "based upon" [8] Maier's public disclosure. Additionally, we need not address the question of whether Relator Cosens was the "original source" of the allegations in his complaint. 31 U.S.C. § 3730(e)(4)(B).

## VI. Conclusion

Accordingly, because we find that there was no public disclosure of an "allegation or transaction" prior to Relator Cosens's filing his *qui tam* action, we deny the Motion to Dismiss for lack of subject matter jurisdiction.

SO ORDERED.

---

**8.** The courts have struggled with the issue of the extent to which a *qui tam* plaintiff may use publicly disclosed information before it can be said that his claim is "based upon" those public disclosures, within the meaning of § 3730(e)(4)(A). The majority view, which has been adopted by the Second Circuit, is that § 3730(e)(4)(A) bars a *qui tam* action based "in any part upon publicly disclosed allegations or transactions ... regardless of where the relator obtained his information." *Kreindler & Kreindler,* 985 F.2d at 1158 (internal quotations and citations omitted); *see also United States ex rel. Precision Co. v. Koch Indus., Inc.,* 971 F.2d 548, 553 (10th Cir. 1992), *cert. denied,* 507 U.S. 951, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993); *Federal Recovery Services,* 72 F.3d at 451 (5th Cir.); *Cooper,* 19 F.3d at 566–67 (11th Cir.); *Findley,* 105 F.3d at 682–84 (D.C.Cir.). The Fourth Circuit, on the other hand, has read the "based upon" language as requiring the relator to have "actually derived" his claim from the disclosure. *See United States ex rel. Siller v. Becton Dickinson & Co.,* 21 F.3d 1339, 1348 (4th Cir.), *cert. denied,* 513 U.S. 928, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994). Given the generic nature of Maier's statements, his failure to identify any fraudulent practice by any specific hospital, his failure to identify any hospital by name, and the fact that his inquiry related to only one device, whereas the Relator's action encompassed 57 different cardiac devices, we have substantial doubt as to whether the Relator's action could be said to have been "based upon" Maier's disclosures, even under the more liberal Second Circuit definition.