Reversed by Supreme Court, March 30, 2010

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA ex rel.
KAREN T. WILSON,
        *Plaintiff-Appellant,*

       v.

GRAHAM COUNTY SOIL & WATER
CONSERVATION DISTRICT; CHEROKEE
COUNTY SOIL & WATER
CONSERVATION DISTRICT; RICHARD
GREENE, in his individual capacity;
WILLIAM TIMPSON, in his individual
capacity; KEITH ORR, in his
individual and official capacities;
RAYMOND WILLIAMS, in his
individual capacity; DALE WIGGINS,
in his individual capacity; GERALD
PHILLIPS, in his individual capacity;
ALLEN DEHART, in his individual
capacity; LLOYD MILLSAPS; JERRY
WILLIAMS, in his individual capacity;
BILLY BROWN, in his individual
capacity; LYNN CODY, in his
individual capacity; BILL TIPTON; C.
B. NEWTON, in his individual
capacity; EDDIE WOOD, in his
individual capacity; GRAHAM
COUNTY,
        *Defendants-Appellees,*

       and

No. 07-1322

GRAHAM COUNTY BOARD OF COUNTY
COMMISSIONERS; CHEROKEE COUNTY
BOARD OF COUNTY COMMISSIONERS;
CHERIE GREENE; RICKY STILES; BETTY
JEAN ORR; JOYCE LANE; JIMMY ORR;
EUGENE MORROW; CHARLES LANE;
CHARLES LANEY; GEORGE POSTELL;
LLOYD KISSLEBURG; TED ORR;
BERNICE ORR; JOHN DOE, JR.; JOHN
DOE CORPORATION; GOVERNMENTAL
ENTITIES, 1-99,

*Defendants.*

UNITED STATES OF AMERICA ex rel.
KAREN T. WILSON,

*Plaintiff-Appellee,*

v.

KEITH ORR, in his individual and
official capacities; JERRY WILLIAMS,
in his individual capacity,

*Defendants-Appellants,*

and

GRAHAM COUNTY SOIL & WATER
CONSERVATION DISTRICT; GRAHAM
COUNTY BOARD OF COUNTY
COMMISSIONERS; CHEROKEE COUNTY
SOIL & WATER CONSERVATION
DISTRICT; CHEROKEE COUNTY
BOARD OF COUNTY COMMISSIONERS;
RICHARD GREENE, in his individual
capacity; CHERIE GREENE; WILLIAM
TIMPSON, in his individual capacity;
RICKY STILES; BETTY JEAN ORR;

No. 07-1910

RAYMOND WILLIAMS, in his
individual capacity; DALE WIGGINS,
in his individual capacity; JOYCE
LANE; GERALD PHILLIPS, in his
individual capacity; ALLEN DEHART,
in his individual capacity; JIMMY
ORR; LLOYD MILLSAPS; BILLY
BROWN, in his individual capacity;
LYNN CODY, in his individual
capacity; EUGENE MORROW; CHARLES
LANE; CHARLES LANEY; GEORGE
POSTELL; BILL TIPTON; LLOYD
KISSLEBURG; C. B. NEWTON, in his
individual capacity; EDDIE WOOD, in
his individual capacity; TED ORR;
BERNICE ORR; JOHN DOE, JR.; JOHN
DOE CORPORATION; GOVERNMENTAL
ENTITIES, 1-99; GRAHAM COUNTY,
                                    *Defendants.*

Appeals from the United States District Court
for the Western District of North Carolina, at Bryson City.
Lacy H. Thornburg, District Judge.
(2:01-cv-00019-LHT)

Argued: January 29, 2008

Decided: June 9, 2008

Before MOTZ, TRAXLER, and DUNCAN, Circuit Judges.

Vacated and remanded by published opinion. Judge Traxler wrote the
opinion, in which Judge Motz and Judge Duncan joined.

**COUNSEL**

**ARGUED:** Mark Tucker Hurt, Abingdon, Virginia, for United States of America ex rel. Karen T. Wilson. Christopher G. Browning, Jr., Solicitor General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina; Zeyland G. McKinney, Jr., Robbinsville, North Carolina, for Graham County Soil & Water Conservation District, Cherokee County Soil & Water Conservation District, Richard Greene, in his individual capacity, William Timpson, in his individual capacity, Keith Orr, in his individual and official capacities, Raymond Williams, in his individual capacity, Dale Wiggins, in his individual capacity, Gerald Phillips, in his individual capacity, Allen Dehart, in his individual capacity, Lloyd Millsaps, Jerry Williams, in his individual capacity, Billy Brown, in his individual capacity, Lynn Cody, in his individual capacity, Bill Tipton, C. B. Newton, in his individual capacity, Eddie Wood, in his individual capacity, Graham County. **ON BRIEF:** Roy Cooper, Attorney General, Raleigh, North Carolina, for Graham County Soil & Water Conservation District, Gerald Phillips, Allen Dehart, Lloyd Millsaps, Cherokee County Soil & Water Conservation District, Bill Tipton, C. B. Newton and Eddie Wood; Sean F. Perrin, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Charlotte, North Carolina, for Graham County, Raymond Williams, Dale Wiggins and Lynn Cody; Roy Patton, Canton, North Carolina, for Richard Greene and Billy Brown.

---

**OPINION**

TRAXLER, Circuit Judge:

The central issue in this appeal is the scope of the "public disclosure" jurisdictional bar contained in the False Claims Act, 31 U.S.C.A. §§ 3729-33 (West 2003 & Supp. 2007).[1] Addressing an

---

[1]A prior appeal in this case addressed the limitations period that governs retaliation claims brought under the False Claims Act. *See Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409 (2005), *reversing United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 367 F.3d 245 (4th Cir. 2004).

issue that has divided the circuit courts, the district court concluded that certain audits and reports issued by state and local governmental entities satisfied the requirements of the public disclosure bar and therefore deprived it of subject matter jurisdiction over this action. We conclude that the public disclosure bar applies to *federal* administrative audits, reports, hearings or investigations, but not to those conducted or issued by a state or local governmental entity. Factual questions remain in this case, however, about whether an investigation and report issued by a federal agency satisfy certain other requirements of the public disclosure bar, and those factual issues must be resolved by the district court in the first instance. Accordingly, we vacate the district court's decision rejecting Wilson's claims and its decision denying the defendants' request for attorneys' fees, and we remand for further proceedings.

I.

A.

In February 1995, a storm hit parts of western North Carolina, causing extensive flooding and erosion. Defendants Graham County and Cherokee County applied for assistance under the Emergency Watershed Protection Program (the "EWP Program"), a federal disaster assistance program operated by the United States Department of Agriculture (the "USDA") and administered through the National Resources Conservation Service (the "NRCS") and the United States Forest Service. *See* 7 C.F.R. §§ 624.1 - 624.11 (2008). The NRCS entered into agreements with the counties (the "EWP contracts") under which the counties would perform or hire a contractor to perform the necessary clean-up and repair work, with the county bearing 25% of the costs and the USDA bearing the remaining costs.

The EWP contracts permitted the counties to coordinate and perform the clean-up through their soil and water conservation districts. As to the EWP contracts that are relevant to this appeal, Graham County and Cherokee County delegated the work to their soil and water conservation districts. Rather than using their own employees, the conservation districts decided to hire independent contractors to perform the remediation work.

The EWP program required an NRCS employee to inspect all work done and certify its compliance with the EWP contract before a county could be reimbursed for the costs of the repair work. Typically, the NRCS's government representative would fill out the reimbursement request based on job diaries and the like maintained by those performing the work. The government representative would submit the reimbursement form to the county for its approval and signature. The government inspector (also an NRCS employee) would inspect the work and certify the claim for payment.

Defendant Richard Greene was the NRCS's district conservationist for the area encompassing Graham and Cherokee counties. Although he was a federal employee, Greene worked out of the offices of the Graham County Soil and Water Conservation District (the "Graham Conservation District"). Greene was the government representative for the Graham County and Cherokee County EWP contracts, and he was also named one of the government inspectors for those contracts. Defendant Bill Timpson, an NRCS soil conservationist, was also designated as a government inspector for the Graham County and Cherokee County EWP contracts.

As the government representative for the EWP contracts, Greene was involved in the selection of a contractor to perform the work on behalf of the counties. Greene had difficulty finding a contractor to perform the Graham County EWP work within the time frame called for by the EWP contract. Defendant and cross-appellant Keith Orr was an employee of the Graham Conservation District. With the approval of Graham County, the Graham Conservation District awarded its EWP work to Orr. Orr was expected to perform the EWP work on his own time, rather than during the hours he was working for the Graham Conservation District, and the parties agreed that he would be paid for the work as any other contractor would be paid. Greene and other federal officials knew that Orr was a conservation district employee and that he had been awarded the EWP work. At Greene's suggestion, the contract to perform Cherokee County's EWP work was awarded to defendant Billy Brown, a friend of Greene's.

Karen Wilson was a secretary for the Graham Conservation District. She contends that in her capacity as secretary, she learned of

irregularities in the performance of the EWP contracts by the Graham Conservation District and by the Cherokee County Soil and Water Conservation District (the "Cherokee Conservation District"). Wilson was troubled by the fact Orr had been hired to perform Graham County's EWP work, and she became suspicious of the arrangements between Greene, Brown, Orr, and Timpson after Orr told her that the men were splitting the proceeds of the EWP contract. One aspect of the Cherokee County EWP work called for downed trees from the affected area to be used to shore up eroded creek banks. Although Greene told Wilson that the logs had been stolen, she later learned that Greene had sold the logs to a lumbermill and kept the proceeds for himself.[2]

In the summer of 1995, Wilson raised her concerns with various county and conservation district officials. Wilson discussed her concerns with two NRCS employees in November 1995 and sent a letter setting out her concerns to the NRCS state office in December 1995. In November 1996, Wilson was interviewed by an agent from the USDA's Office of Inspector General about the EWP contracts.

After learning of the problems with the EWP contracts, Graham County officials began an investigation of their own. County officials eventually determined that Orr had charged them for some EWP work that had not been performed. Although the county officials involved with the EWP contracts did not believe that using Orr as an independent contractor was improper, a March 1996 report following an audit performed by an accounting firm at the request of Graham County (the "Audit Report") raised concerns about the county's failure to seek bids on the work to be performed under the EWP contract and the use of Orr as an independent contractor receiving payment under the EWP contracts. A May 1996 report prepared by the North Carolina Department of Environment, Health and Natural Resources (the "DEHNR Report") noted the same problems identified in the Audit Report.

---

[2]Greene was later convicted in federal district court for misappropriating the logs and other acts of misconduct.

B.

In 2001, Wilson commenced this action under the False Claims Act, naming as defendants (among others) Graham County, Cherokee County, Graham Conservation District, Cherokee Conservation District, Greene, Orr, Brown, and Timpson. Wilson alleges that a conspiracy existed between Greene, Orr, Timpson, and Brown. According to Wilson, the men agreed that Greene would funnel the Graham County and Cherokee County EWP work to Brown and Orr and that Greene and Timpson would inspect the work and approve the bills for payment, with the money paid under the EWP contracts to be shared among the co-conspirators. Wilson contends that the conspiracy effectively tainted the execution of the EWP agreements and rendered the claims for reimbursement false within the meaning of the False Claims Act.

Wilson also contends that some or all of the claims submitted by the counties to the federal government for reimbursement under the EWP program were false within the meaning of the False Claims Act because: (1) the counties failed to seek bids as required by state law before awarding the EWP work to Orr and Brown; (2) using Orr as an independent contractor created a conflict of interest in violation of the Code of Conduct submitted to the federal government by Graham County; (3) the Graham County work performed by Orr was of poor quality and did not meet the requirements of the EWP contracts; and (4) Greene stole the Cherokee County logs with the knowledge of Cherokee County officials, who permitted Greene to keep the proceeds as a sort of retroactive bribe.

The district court concluded that the Audit Report prepared by local accountants at the request of Graham County and the DEHNR Report were public disclosures of the information underlying Wilson's claims. Because the False Claims Act strips courts of subject matter jurisdiction over private claims based on information that has been publicly disclosed, *see* 31 U.S.C.A. § 3730(e)(4)(A) (West 2003), the district court concluded that it lacked jurisdiction over Wilson's action. In the alternative, the district court concluded that for various reasons, each of Wilson's claims failed on the merits. The district court therefore granted summary judgment in favor of the defendants, but the court later denied the defendants' requests for

attorneys' fees. *See* 31 U.S.C.A. § 3730(d)(4) (authorizing award of attorneys' fees to prevailing defendants in *qui tam* action where the government does not intervene if the court concludes the action "was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment").

## II.

The False Claims Act (the "FCA") was enacted "during the Civil War in response to overcharges and other abuses by defense contractors, . . . [with the expectation that it] would help the government uncover fraud and abuse by unleashing a posse of *ad hoc* deputies to uncover and prosecute frauds against the government." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (internal quotation marks omitted). The FCA imposes civil liability (including treble damages and a fine of up to $10,000) on persons who knowingly submit false claims to the government for payment or conspire to use false claims to obtain payment from the government. *See* 31 U.S.C.A. § 3729 (West 2003 & Supp. 2007).

FCA actions against the false claimant may be brought by the government itself or by a private person (known as the "relator") on behalf of the government. *See* 31 U.S.C.A. § 3730. Actions brought by a relator are known as "*qui tam*" actions. *See Vermont Agency of Nat. Resources v. United States ex rel. Stevens*, 529 U.S. 765, 768 n.1 (2000) ("Qui tam is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.'"). The government has the right to intervene in actions brought by a relator, *see* 31 U.S.C.A. § 3730, but a successful relator receives a share of any proceeds recovered in the action whether or not the government intervenes. *See* 31 U.S.C.A. §§ 3730(d)(1)-(2). "A *qui tam* relator [thus] is essentially a self-appointed private attorney general, and his recovery is analogous to a lawyer's contingent fee." *United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir. 1992).

The FCA bars federal courts from exercising subject matter jurisdiction over certain *qui tam* actions. *See Rockwell Int'l Corp. v.*

*United States*, 127 S. Ct. 1397, 1405-06 (2007). The only such bar relevant to this case is the public disclosure bar, which provides that

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C.A. § 3730(e)(4) (West 2003).

The structure of the public disclosure bar thus requires courts to answer three questions: Was there a public disclosure? If there was a public disclosure, was the *qui tam* action based on the public disclosure? If the action was based on the public disclosure, was the *qui tam* plaintiff an original source? *See Grayson v. Advanced Mgmt. Tech., Inc.*, 221 F.3d 580, 582 (4th Cir. 2000); *see also Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1042 (8th Cir. 2002); *United States v. Bank of Farmington*, 166 F.3d 853, 859 (7th Cir. 1999). If either of the first two questions is answered in the negative, the district court has subject matter jurisdiction over the *qui tam* action. If the first two questions are answered in the affirmative, however, subject matter jurisdiction exists only if the last question is also answered affirmatively.

On appeal, Wilson contends that the Audit Report and DEHNR Report do not qualify as public disclosures under the FCA and that the district court therefore erred by concluding that these reports deprived it of subject matter jurisdiction. Although § 3730(e)(4)(A) provides that an administrative report, audit, or investigation can

amount to a jurisdiction-stripping public disclosure, Wilson argues that the statute applies only to *federal* administrative reports or audits. Because the audit was conducted by local accountants at Graham County's request and the Audit Report was provided to Graham County officials only, Wilson contends that there was no public disclosure within the meaning of § 3730(e)(4)(A). Wilson likewise argues that the DEHNR Report, which summarized a state investigation and was provided only to state and local officials, was not a public disclosure within the meaning of § 3730(e)(4)(A).

For their part, the defendants contend that the district court correctly determined that the public disclosure bar deprived it of subject matter jurisdiction over Wilson's claims. The defendants argue that there is no language in § 3730(e)(4)(A) expressly limiting its reach to federal rather than state administrative reports and audits, and they note that the majority of the circuit courts considering the question have rejected Wilson's interpretation of the statute.

## A.

"When interpreting a statute, the goal is always to ascertain and implement the intent of Congress." *Scott v. United States*, 328 F.3d 132, 138 (4th Cir. 2003). "The first step of this process is to determine whether the statutory language has a plain and unambiguous meaning. If the statute is unambiguous and if the statutory scheme is coherent and consistent, our inquiry ends there." *Id.*

Section 3730(e)(4)(A) lists the sources that may give rise to a jurisdiction-stripping public disclosure: disclosures "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media."[3] 31 U.S.C.A. § 3730(e)(4)(A). When

---

[3]The list of disclosure sources is exclusive; a public disclosure of fraud operates as a jurisdictional bar against a *qui tam* plaintiff's action *only* if the public disclosure is through one of the specified sources. *See Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 870 (4th Cir. 1999); *accord United States ex rel. Dunleavy v. County of Del.*, 123 F.3d 734, 744 (3d Cir. 1997); *United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1513 n.2 (8th Cir. 1994).

considering the scope of the public disclosure bar, courts often separate the relevant language by clause, each of which addresses distinct categories of potential disclosure sources, and then analyze the meaning clause by clause. *See, e.g.*, *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 870 (4th Cir. 1999) (grouping listed sources into categories for purposes of statutory interpretation); *see also United States ex rel. Bly-Magee v. Premo*, 470 F.3d 914, 917 (9th Cir. 2006) (same), *cert. denied*, 128 S. Ct. 1119 (2008). Thus, the public disclosure bar strips federal courts of jurisdiction over *qui tam* actions that are based upon the public disclosures in (1) "criminal, civil, or administrative hearing[s]"; (2) "congressional, administrative, or Government Accounting Office[4] report[s], hearing[s], audit[s], or investigation[s]"; and (3) "the news media." 31 U.S.C.A. § 3730(e)(4)(A). The only category implicated in this case is the second one, which strips federal courts of jurisdiction over *qui tam* actions that are based on public disclosures in a congressional, administrative, or GAO report, hearing, audit, or investigation.

As far as the record reveals, there has been no congressional or GAO action involving the transactions at issue in this case. The jurisdictional question therefore turns upon whether the state- and county-level investigations into and reports about the handling of the EWP contracts can be considered administrative reports, audits, or investigations within the meaning of § 3730(e)(4)(A).

---

[4]When § 3730(e)(4) was enacted, the official name for the GAO, the familiar federal watchdog agency, was the "General Accounting Office." While the statute speaks of the "Government Accounting Office," it is generally understood that Congress was referring to the GAO. *See* 31 U.S.C.A. § 3730(e)(4)(A) n.3 (stating in footnote following the word "Government": "So in original. Probably should be 'General.'"); *United States ex rel. Mistick PBT v. Housing Auth. of Pittsburgh*, 186 F.3d 376, 387 (3d Cir. 1999) ("[T]his section refers to the General Accounting Office as the 'Government Accounting Office'. . . ."); *see also United States v. Catholic Healthcare West*, 445 F.3d 1147, 1151 (9th Cir. 2006); *United States ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726, 728 (7th Cir. 2006). This statutory misnomer became somewhat less of a misnomer in 2004, when the GAO was renamed the "Government Accountability Office." *See* GAO Human Capital Reform Act of 2004, Pub. L. 108-271, § 8(a), 118 Stat. 811, 814 (2004).

The few circuits to have considered this question have come to different conclusions. The Third Circuit thus far is alone in concluding that the public disclosure of state administrative actions does not amount to a public disclosure within the meaning of § 3730(e)(4)(A), *see United States ex rel. Dunleavy v. County of Del.*, 123 F.3d 734, 745 (3d Cir. 1997), while the Ninth Circuit and the Eleventh Circuit have concluded that § 3730(e)(4)(A) encompasses state as well as federal administrative actions, *see United States ex rel. Bly-Magee v. Premo*, 470 F.3d 914, 918-19 (9th Cir. 2006), *cert. denied*, 128 S. Ct. 1119 (2008); *Battle v. Board of Regents*, 468 F.3d 755, 762 (11th Cir. 2006). In *Hays v. Hoffman*, 325 F.3d 982 (8th Cir. 2003), the Eighth Circuit took the middle road, not quite agreeing with the Third Circuit or with the Ninth and Eleventh Circuits. The *Hays* court "reject[ed]" the particular manner in which the Third Circuit in *Dunleavy* had parsed the statute. *Id.* at 988. However, the *Hays* court ultimately concluded only that the Third Circuit's holding was broader than necessary, and the court held that state reports and audits could be public disclosures, at least where reports and audits involved a cooperative state-federal program. *See id.* at 989 ("[W]hile we do not disagree with the Third Circuit's decision in *Dunleavy*, we conclude the court ruled more broadly than necessary in stating that a state agency disclosure may never be an administrative report or audit for purposes of § 3730(e)(4)(A)." (internal quotation marks and alterations omitted)).

This court has not previously considered whether state or local administrative reports, audits, or investigations can be public disclosures within the meaning of § 3730(e)(4)(A). As the defendants point out, the statute by its express terms does not limit its reach to federal administrative reports or investigations. In our view, however, examination of the relevant language in context and consideration of the structure of the statute leads to the conclusion that only federal administrative reports, audits or investigations qualify as public disclosures under the FCA. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (internal quotation marks omitted)); *Crandon v. United States*, 494 U.S. 152, 158 (1990) ("In determining the meaning of the

statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.").

Of the three disclosure sources listed in clause two of § 3730(e)(4)(A), the first and third are clearly *federal* sources — congressional or GAO reports, hearings, investigations, and audits. Unlike those terms, there is nothing inherently federal about the word "administrative," and Congress did not define the term in the FCA. The placement of the word in the statute, however, provides strong evidence of its intended meaning.

The interpretative maxim *noscitur a sociis* provides that "a word is known by the company it keeps." *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 378 (2006) (internal quotation marks omitted). The maxim "is invoked when a string of statutory terms raises the implication that the words grouped in a list should be given related meaning." *Id.* (internal quotation marks omitted). "That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S. 368, 371 (1994).

In our view, the placement of "administrative" squarely in the middle of a list of obviously federal sources strongly suggests that "administrative" should likewise be restricted to *federal* administrative reports, hearings, audits, or investigations. As the Third Circuit explained:

> [Application of the *noscitur a sociis*] maxim leads to the conclusion that "administrative" when read with the word "report" refers only to those administrative reports that originate with the federal government. We take notice of the fact that Congress and the Government Accounting Office are entities of our federal government. We find it hard to believe that the drafters of this provision intended the word "administrative" to refer to both state and federal reports when it lies sandwiched between modifiers which are unquestionably federal in character.

*Dunleavy*, 123 F.3d at 745. Although courts must not apply interpretative maxims "woodenly," *Ali v. Federal Bureau of Prisons*, 128

S. Ct. 831, 840 (2008), we believe that reliance on *noscitur a sociis* is appropriate in this case.

If the list in clause two were *entirely* disjunctive, our analysis might be different. Unless context dictates otherwise, a completely disjunctive formulation (*i.e.*, "item A *OR* item B *OR* item C") "indicates an intent to give the nouns their separate, normal meanings," *Garcia v. United States*, 469 U.S. 70, 73 (1984), and thus typically makes reliance on *noscitur a sociis* inappropriate, *see In re Continental Airlines, Inc.*, 932 F.2d 282, 288 (3d Cir. 1991) (explaining that "*noscitur a sociis* . . . is of little help where other evidence reveals that Congress intended to treat the disputed term differently from its neighbors"). Section 3730(e)(4)(A), however, uses the more typical form of statutory listing, referring to "congressional, administrative, or Government Accounting Office" reports, audits, and investigations. This formulation does not indicate an attempt by Congress to treat "congressional," "administrative," and "Government Accounting Office" separately.

Moreover, the exclusively federal nature of the terms "congressional" and "Government Accounting Office" is immediately apparent, and these clearly federal terms bookend the not-so-clearly federal term, thus providing a very strong contextual cue about the meaning of "administrative." *See Ali*, 128 S. Ct. at 839 (refusing to rely on *noscitur a sociis* when interpreting an exception to the Federal Tort Claims Act's waiver of sovereign immunity where "no relevant common attribute immediately appear[red]" among the categories listed in the statutory exception and the exception did not contain "strong[ ] contextual cues" that the listed categories should be interpreted similarly).

The defendants, however, contend that limiting clause two to federal administrative reports, audits, or investigations would be inconsistent with the disclosure category of clause one, which addresses disclosures in a "criminal, civil, or administrative hearing." This court and others have understood clause one to encompass state as well as federal hearings. *See McElmurray v. Consolidated Gov't of Augusta-Richmond County*, 501 F.3d 1244, 1252-53 (11th Cir. 2007); *United States ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 332-33 (3d Cir. 2005); *United States ex rel. Reagan v. East Tex. Med. Ctr. Reg'l*

*Healthcare Sys.*, 384 F.3d 168, 174 (5th Cir. 2004); *A-1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1244 (9th Cir. 2000); *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1350 (4th Cir. 1994). The defendants contend that if a state hearing can satisfy the requirements of § 3730(e)(4)(A), then a state audit, investigation, or report should likewise meet the requirements of the statute. The essence of the defendants' argument in this regard is set out in a district court opinion upon which the defendants rely:

> [L]imiting the word "administrative" to only federal administrative reports, audits and investigations is inconsistent with the plain language of the phrase at issue as well as the language and interpretation of the remaining portions of § 3730(e)(4)(A). The immediately preceding phrase in that statutory section provides that public disclosures include any "criminal, civil, or administrative hearing," and courts have consistently interpreted that phrase to include both *state* and *federal* litigation and administrative hearings. Likewise, this section of the FCA also gives public disclosure status to "the news media" regardless of whether that media is national, state, or local. *There is no reason to conclude that Congress intended to limit administrative reports, audits, and investigations to federal actions, while simultaneously allowing all state and local civil litigation, state and local administrative hearings, and state and local news media to be treated as public disclosures.* To interpret the statute so narrowly would have the anomalous result of allowing public disclosure status to the most obscure local news report and the most obscure state and local civil lawsuit or administrative hearing, but denying public disclosure status to a formal public report of a state government agency . . . .

*In re Nat. Gas Royalties Qui Tam Litig.*, 467 F. Supp. 2d. 1117, 1143-44 (D. Wyo. 2006) (underscored emphasis added; footnote and citations omitted); *see also Bly-Magee*, 470 F.3d at 918 ("[T]he statute would seem to be inconsistent if it included state and local administrative hearings as sources of public disclosures and then, in the next breath, excluded state administrative reports as sources.").

Although we ultimately disagree with this approach to the statute, we must admit that there is some force to the argument. The courts have easily concluded that clause one applies to state-level hearings—in fact, only one court thus far has explicitly addressed the possibility that clause one should be limited to federal hearings, *see A-1 Ambulance Serv.*, 202 F.3d at 1244—and there is some logic and symmetry to taking a similar approach to clause two.

Nonetheless, we believe that this analysis has its own shortcomings. First of all, we note that both clause one and clause two refer to administrative hearings: Clause one states that public disclosures can occur in "criminal, civil, or administrative hearing[s]," and clause two states that public disclosures can occur in "congressional, administrative, or Government Accounting Office report[s], hearing[s], audit[s], or investigation[s]." 31 U.S.C.A. 3730(e)(4)(A). If clause one and clause two both encompass state administrative hearings, as the defendants contend, then there was no reason for Congress to repeat the word "hearings" in clause two. *See A-1 Ambulance Serv.*, 202 F.3d at 1245 ("*Dunleavy*'s interpretation buttresses our conclusion [that clause one is not limited to federal administrative hearings] because one may presume that Congress acted intentionally in including the modifying language in one clause, but omitting it in another. It is unlikely that Congress would have referenced administrative hearings twice in the same sentence, unless it intended to allude to different contexts." (citation omitted)).[5]

---

[5]Because courts have interpreted clause one to encompass state and federal hearings, either interpretation of clause two yields some amount of redundancy. Under the *Dunleavy* approach, the statute as interpreted by the courts is redundant because federal administrative hearings would qualify as sources of public disclosures under clause one or clause two. Under the interpretation urged by the defendants, the statute unnecessarily refers to administrative hearings in both clause one and clause two. While we would of course prefer to avoid all redundancies, the redundancy that exists under the *Dunleavy* approach is a latent one—that is, the redundancy is a function of the interplay between the judicial interpretations of clause one and clause two. The defendants' approach to the statute, however, creates a patent redundancy in the language affirmatively chosen by Congress. Given the choice between tolerating a judicially-created redundancy or rendering redundant language chosen by Congress, the former seems more consistent with traditional principles of statutory construction.

More importantly, however, to adopt the interpretative approach urged by the defendants would require us to all but ignore the significance of the inherently federal language chosen by Congress in clause two. As reflected in the analysis of district court quoted above, the defendants' approach to the statute suggests that because neither clause one nor clause two limit their reach to federal sources, we therefore should not view clause two's references to Congress and the GAO as limiting the reach of clause two. We find this argument unpersuasive.

Preliminarily, we note that in this country there is no "federal" news media, nor for that matter is there any "state" news media from which "federal" news media could be distinguished. Of course, some news media are national in scope and reach while others are local, but "national" in this context cannot be equated with "federal." It thus seems inappropriate to draw significance from the statute's failure to attach any qualification or limitation to public disclosures that are made by the news media.

More generally, however, we believe the defendants' interpretation of clause two is contrary to the basic principle that, where possible, courts should give effect to every word in a statute. *See, e.g.*, *Clinchfield Coal Co. v. Harris*, 149 F.3d 307, 313 (4th Cir. 1998). If Congress had intended clause two to encompass state audits, reports, or investigations, it could have saved a few words by referring to disclosures in *governmental* audits, reports, or investigations, a phrasing that avoids the use of words that are inherently and exclusively federal in nature. Congress instead provided that the jurisdictional bar applies to disclosures in a "congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation." We believe this use of inherently federal modifiers was deliberate and significant, and that it would be improper to discount its significance simply because there is no similar limiting language in clause one or clause three. *Cf., e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and alteration omitted)).

We would not be the first court to observe that the FCA's public disclosure bar is far from a model of careful draftsmanship. *See Mistick PBT*, 186 F.3d at 387, 388 (stating that § 3730(e)(4)(A) "does not reflect careful drafting or a precise use of language," and describing it as "syntactically ambiguous"); *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 681 (D.C. Cir. 1997) ("Virtually every court of appeals that has considered the public disclosure bar explicitly or implicitly agrees on one thing, however: the language of the statute is not so plain as to clearly describe which cases Congress intended to bar."). While it may not be the strongest of interpretative principles, we nonetheless believe that the *noscitur a sociis* principle is the best tool short of a secret decoder ring with which to gain insight into the meaning of this murky statute.

And when we consider the congressional fine-tuning of the FCA over the years, we believe it provides further support for the understanding of the statute suggested by application of *noscitur a sociis*. Since the enactment of the FCA, Congress twice has passed major revisions intended to strike the proper balance "between encouraging private citizen involvement in exposing fraud against the government while preventing opportunistic suits by private persons who became aware of fraud but played no part in exposing it." *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 702 (8th Cir. 1995).

Perhaps the most notorious of these opportunistic (or "parasitic" suits[6]) is *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943). In *Hess*, because there was no statutory language prohibiting it, the Supreme Court upheld a verdict in favor of a *qui tam* relator who copied his information about fraud by a government contractor directly from the allegations in a criminal indictment brought by the federal government against that contractor. *See id.* at 546-48.

---

[6]"[P]arasitic lawsuits copied from preexisting indictments or based upon congressional investigations . . . not only diminished the government's ultimate recovery without contributing any new information, but the rush to the courthouse put pressure on the government to make hasty decisions regarding whether to prosecute civil actions." *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 679-80 (D.C. Cir. 1997).

In response to *Hess*, Congress in 1943 amended the FCA to deprive courts of jurisdiction over *qui tam* actions that were based on evidence or information in the government's possession when the *qui tam* action is filed. *See Findley*, 105 F.3d at 680. While the 1943 amendments did close the door to parasitic actions, the amendments likewise closed the door to the very claims the *qui tam* provisions were originally intended to encourage — claims brought by "those whistleblowers who furnished evidence or information to the government in the first place." *Id.* Congress eventually realized that by "eliminat[ing] the financial incentive to expose frauds against the government," the 1943 amendments "had killed the goose that laid the golden egg" and resulted in a dramatic decrease in the use of *qui tam* actions to combat fraud. *Id.* Congress amended the FCA in 1986, again aiming for "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *United States ex rel. Springfield Terminal Ry Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994). The 1986 amendments, among other things, eliminated the government-knowledge jurisdictional bar that had been added to the FCA in 1943 and replaced it with the public-disclosure bar at issue in this action. *See id.* at 651.

In our view, the defendants' interpretation of the statute becomes untenable when we recognize that the public-disclosure bar was the product of Congress's repeated efforts to further the "twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own." *Id.*; *see also United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999) (recognizing that with the 1986 amendments to the FCA, "Congress struck a careful balance between encouraging citizens to report fraud and stifling parasitic lawsuits").

Information about federal investigations and audits is easily available to the members of the Department of Justice charged with enforcing the FCA. Prohibiting *qui tam* actions based on public disclosure of these federal investigations is completely consistent with the goal of discouraging actions that the government is capable of pursuing itself. We cannot conclude, however, that information about most state and local investigations, audits, or reports is particularly

likely to come to the attention of the federal government. State or local audits and investigations often involve a small number of public employees and address issues that directly affect a very small segment of the local population. The general public often is not aware that an audit or investigation is being conducted, and the outcome of the audit or investigation may receive little or no publicity. Moreover, there is no central location (like a county courthouse with a searchable docket) where information about such proceedings is kept and made available to the public. The likelihood of the federal government learning about the audit or investigation or the underlying information is thus very small.

Because the federal government is unlikely to learn about state and local investigations, a large number of fraudulent claims against the government would go unremedied without the financial incentives offered by the *qui tam* provisions of the FCA. If the public-disclosure bar were to encompass investigations and reports at the state and local level, as the defendants contend, the effect would be to discourage private actions that the federal government is *not* capable of pursuing on its own, thus frustrating rather than furthering the goals of the FCA.

Accordingly, given the grammatical structure of § 3730(e)(4)(A), we agree with the Third Circuit that the phrase "congressional, administrative, or [GAO] report, hearing, audit, or investigation" is properly understood to include only federal administrative reports, hearings, audits, or investigations.[7] Because the Audit Report was prepared by

---

[7]Although it is not dispositive, we note that the United States intervened on appeal in *Hays* to urge the Eighth Circuit to follow the Third Circuit's decision in *Dunleavy*. *See* Brief for the United States of America as Intervenor, 2002 WL 32181440, at *38-41 (May 2002). At the invitation of the Supreme Court, the United States also filed an amicus brief in connection with the petition for certiorari filed after the Ninth Circuit's decision in *Bly-Magee*. The United States again expressed support for the Third Circuit's reading of the public disclosure bar but recommended that the Supreme Court wait for further developments in the law before reviewing the issue. *See* Brief for the United States as Amicus Curiae, 2007 WL 4613626, at *7 (Dec. 21, 2007). The Supreme Court denied the *certiorari* petition. *See United States ex rel. Bly-Magee v. Premo*, 128 S. Ct. 1119 (2008).

the county and the DEHNR Report was produced by the state, the reports were not public disclosures within the meaning of § 3730(e)(4)(A). The district court therefore erred in concluding that these reports worked to deprive it of subject matter jurisdiction over Wilson's *qui tam* action.

B.

As previously noted, Wilson in November 1996 cooperated with a federal investigation into the Cherokee and Graham County EWP contracts, speaking on multiple occasions to an agent from the USDA's Office of Inspector General. The USDA eventually issued a report in which it concluded that while there were problems with the administration of the Graham and Cherokee EWP contracts, there was no conspiracy between Greene, Orr, Timpson, and Brown. Although it is not entirely clear, it appears from the district court's order that the court also viewed this investigation and report as a public disclosure that deprived it of jurisdiction over Wilson's action. Neither Wilson nor the defendants in their briefs devote much attention to the USDA investigation or report. Nonetheless, because the FCA's public disclosure bar is jurisdictional, we are obliged to consider the issue on our own. *See Rockwell*, 127 S. Ct. at 1406.

Because the USDA investigation and report were conducted and issued by a federal agency, they qualify as an administrative hearing or report under our reading of § 3730(e)(4)(A). There are, however, additional questions that must be resolved as part of the public disclosure inquiry: whether the investigation or report were publicly disclosed, and if so, whether the claims asserted in Wilson's *qui tam* complaint were "based upon" the public disclosure.

(1)

The mere existence of an administrative investigation or report is not enough to trigger the jurisdictional bar of § 3730(e)(4)(A). Instead, the investigation or report amounts to a jurisdiction-stripping public disclosure only if the investigation or report is in fact publicly disclosed. *See, e.g.*, *Grayson*, 221 F.3d at 582; *Siller*, 21 F.3d at 1350.

The district court did not expressly find that either the USDA investigation or report were publicly disclosed, and the record does not contain sufficient evidence on this point that would permit this court to determine as a matter of law whether the investigation or report were publicly disclosed. We must therefore remand to permit the district court to make the necessary factual finding.

(2)

A federal administrative investigation or report will operate as a bar to the exercise of subject matter jurisdiction over a *qui tam* action only if the *qui tam* claims are "*based upon* the public disclosure" of the allegations in the report. 31 U.S.C.A. § 3730(e)(4)(A) (emphasis added).

Most circuits have held that "a *qui tam* suit is 'based upon' a public disclosure whenever the allegations in the suit and in the disclosure are the same, 'regardless of where the relator obtained his information.'" *Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1044-47 (8th Cir. 2002) (adopting majority rule and collecting cases). In this circuit, however, a *qui tam* action is based upon publicly disclosed allegations *only* if the *qui tam* plaintiff's allegations were actually *derived from* the public disclosure itself:

> To "base upon" means to "use as a basis for." Rather plainly, therefore, a relator's action is "based upon" a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his *qui tam* action is based.

*Siller*, 21 F.3d at 1348; *accord United States ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730, 737-38 (7th Cir. 2007). Under *Siller*, a *qui tam* action will not be barred if the plaintiff's claims are similar or even identical to the publicly disclosed allegations, so long as the plaintiff had independent knowledge of the facts and did not derive his allegations from the public disclosure itself.

Whether a *qui tam* plaintiff's FCA claims were derived from a public disclosure as defined in § 3730(e)(4)(A) is a question of fact, *see*

*Siller*, 21 F.3d at 1349, but it is not clear from the district court's order that the court made the required factual finding. Although the district court in its order recited the "derived from" standard, the district court never explicitly held that Wilson's claims were derived from any of the documents that the district court viewed as public disclosures, much less that her claims were derived from the USDA investigation or report. If anything, the district court's abbreviated analysis seems to suggest that the court in fact applied the broader "based on" standard used in other circuits rather than *Siller*'s more stringent "derived from" standard.

In a portion of the opinion focusing on the effect of the county-issued Audit Report, the district court stated that, "to the extent that any allegations of the complaint *overlap this information*, the jurisdictional bar would apply unless Wilson shows by a preponderance of the evidence that she was an original source of the information upon which these statements were based." J.A. 1750. As noted above, we held in *Siller* that the mere similarity of the plaintiff's allegations to the public allegations is irrelevant; what matters is whether the plaintiff actually derived her claims from the public disclosure itself. By focusing on whether Wilson's allegations merely *overlapped* the allegations of the Audit Report, it appears that the district court applied the wrong standard when determining whether the public-disclosure bar applied.

Because the district court made no findings as to whether the USDA investigation or report was publicly disclosed or whether Wilson's claims were derived from the USDA investigation or report, we cannot at this juncture determine whether the public-disclosure bar applies. Accordingly, we must vacate the district court's decision and remand to give the district court the opportunity to make the necessary factual determinations. *See Siller*, 21 F.3d at 1349 ("[B]ecause the district court made no finding on whether Siller actually derived his allegations from the SSI suit, a finding necessary to the conclusion that Siller's action was 'based upon' that suit, we . . . vacate the portion of the district court's order dismissing Siller's action so as to enable the court to address this factual question on remand."); *see also United States ex rel. Boothe v. Sun Healthcare Group, Inc.*, 496 F.3d 1169, 1177 (10th Cir. 2007) ("Because the application of the 'based upon' and 'original source' tests turn on important factual

questions, ones on which we have no record before us, we think the appropriate course is to remand the matter for the district court's consideration in the first instance."); *United States v. A.D. Roe Co.*, 186 F.3d 717, 726 (6th Cir. 1999) (vacating and remanding so that district court could make necessary factual findings as to whether *qui tam* plaintiff's claims were based on publicly disclosed information).

On remand, the district court shall permit the parties to submit additional evidence as may be necessary for the court to make the factual determinations upon which the jurisdictional questions turn. If the district court determines that the USDA investigation or report was publicly disclosed and that Wilson's claims were derived from those public disclosures, the court must then determine whether Wilson is an original source as to any of her claims. When considering these jurisdictional questions, the district court should keep in mind that, as the Supreme Court made clear in *Rockwell*, it is not enough for a *qui tam* plaintiff to show that jurisdiction exists over one of her claims. Instead, a *qui tam* plaintiff must establish that jurisdiction exists over *each* individual claim. *See Rockwell*, 127 S. Ct. at 1410 ("Section 3730(e)(4) does not permit jurisdiction in gross just because a relator is an original source with respect to some claim. . . . [A] plaintiff's decision to join all of his or her claims in a single lawsuit should not rescue claims that would have been doomed by section (e)(4) if they had been asserted in a separate action. And likewise, this joinder should not result in the dismissal of claims that would have otherwise survived." (internal quotation marks omitted)). The district court's analysis should thus proceed on a claim-by-claim basis, individually addressing "each reasonably discrete claim of fraud" and explaining whether the court has jurisdiction over that claim. *Boothe*, 496 F.3d at 1177.

### III.

As mentioned previously, the district court, in an alternative ruling, addressed and rejected Wilson's claims on the merits. While we appreciate the district court's concern for judicial economy, it was error for the court to address the merits of Wilson's claims after concluding that it lacked subject matter jurisdiction over the action. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184, 1191 (2007) ("Without jurisdiction the court cannot proceed at

all in any cause; it may not assume jurisdiction for the purpose of deciding the merits of the case." (internal quotation marks omitted)); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case."). And because we cannot yet determine whether subject matter jurisdiction exists, we similarly are unable to consider the merits of the appeal or cross-appeal. Accordingly, we vacate the district court's decisions granting judgment to the defendants and denying attorneys' fees to the cross-appellants, and we remand for further proceedings consistent with this opinion.

If on remand the district court again concludes that the public disclosure bar applies and deprives the court of subject matter jurisdiction, then the court should not consider the merits of Wilson's claims. If, however, the court concludes that it has jurisdiction over some or all of Wilson's claims, the district court may then proceed to consider the merits of those claims. If the court believes that its prior opinion rejecting Wilson's claims on the merits sufficiently addresses all relevant issues, the court may issue an opinion adopting the relevant portions of the prior opinion. And if the district court rejects Wilson's claims on jurisdictional grounds or on the merits, it should again consider the defendants' requests for attorneys' fees, and the court may adopt its prior analysis of the fee request or address the issue anew. We emphasize, however, that nothing in our mandate should be read to preclude the district court from considering the merits of the *qui tam* claims anew or, if the court deems it appropriate, permitting the parties to submit additional evidence or argument supporting their claims.

*VACATED AND REMANDED*